Booth, Judge,
delivered the opinion of the court.
Under the terms of a written contract the plaintiff company assumed obligations to dredge and dispose of 4,177,110 cubic yards of material, scow measurement, in Newark Bay and Passaic Biver for the sum of 16¿ cents per cubic yard. The dredging work provided for in the contract was intended to secure for the defendant a channel 16 feet deep at mean low water, extending 10.8 miles from Staten Island Sound to the Montclair & Greenwood Lake Bailroad bridge. It was to be 300 feet wide for a distance of 9.7 miles and 200 feet from there on, a distance of 1.1 miles, and the contract so provided. Work was to commence within a month after the contractor received notice of the approval of the contract, and was to be prosecuted faithfully and diligently. The specifications, which are made a part of the contract, contained a provision for the retention by the defendant of 10 per cent of all payments made thereunder until half of the work was completed, a fact to be determined by the engineer, and thereafter the plaintiff was to receive payment in full. The work under the contract progressed without any undue friction, and in a manner satisfactory to both parties, until January 1, 1910. As a matter of fact, there was no complaint lodged against the contractor, and none could have been. Subsequent to this time trouble began to develop. The plaintiff fell far below its theretofore efficiency, until at last on September 24,1912, it ceased work entirely, ascribing its difficulties to a distinct change in the character of the material encountered, a difference so violent as to amount, according to the allegations of the petition, to misrepresentation upon the part of the defendant in its specifications. On November 1, 1912, the plaintiff wrote the Secretary of War asking to be relieved from its contract, and predicating its request upon the substantial difference between the character of the material to be dredged, as shown in the specifications, and that actually encountered in the performance of the work, stating the difference to be such as to make the cost of removing the same inequitable and unjust to the contractor. The Chief of Engineers declined to accede to plaintiff’s request, notified the company to proceed with the work, and upon its failure to do so annulled the contract on March 14, *682 1913. The contract provided for such, a proceeding, and paragraph 4 thereof authorized the defendant to relet the work and recoup the difference in price, if any, from the first contractor. This course was followed by the defendant. The plaintiff company had been paid for all work done up to September 24, 1912, except an alleged mistake in computation included in this suit, and $33,998.15 retained percentages withheld by the defendant under the provisions of the contract. This suit is for the recovery of both items, the $33,998.15 retained and $14,543.26, an alleged underpayment. We have not said anything about the supplemental agreement between the parties executed August 3,1911, because it in no way varies the issue except argumentatively.
If the facts in this case correspond with the facts in the cases of Christie v. United States, 237 U. S. 234, and Hollerbach v. United States, 233 U. S. 165, the plaintiff is entitled to judgment. Of course, such a result might follow, even though there be no such similarity. Inasmuch, therefore, as the contention made indispensably involves a discussion of the facts, the court has endeavored to find them from a record not especially contradictory nor involved.
The contract sued upon was the result of a public advertisement for bids to do the contemplated work. As usual, the defendant made public and available to bidders such information respecting the work as it possessed, which bidders might call for. The plaintiff company was manifestly anxious and deeply concerned in its efforts to procure the contract, for its bid for the same was so decidedly beneath all others that it is inconceivable that experienced engineers would have dreamed of the undertaking at such a figure, unless some other and outside consideration inspired it. The plaintiff company, prior to submitting its bid, had before it subdivision (c) of paragraph 19 of the specifications, as follows :
“ Character of Material. The material to be excavated is believed to be mud, sand, and gravel, but bidders are expected to examine the work and decide for themselves as to its character and make their bids accordingly, as the United States will not guarantee the accuracy of this description. The price per cubic yard will cover the removal of all material encountered except ledge rock.”
*683 It also bad before it borings or soundings shown on three separate sheets, 143 in number, made in November and December, 1906, disclosing conditions found over a distance of 10.8 miles, and conveniently divided into three separate areas, the first sheet disclosing borings in 42 separate places over a distance of 2.2 miles, the second indicating the result at 32 separate places over a distance of 3.1 miles, and the third showing the balance of the 143 over a distance of 5.5 miles. In addition to the above three blue prints, a report made by the Chief of Engineers of the Army to Congress and published as a public document was furnished to the contractor by the defendant, in which it was said, among other things: “ On the whole, the dredging would be comparatively easy and the cost moderate.” Irrespective of this information, the plaintiff company in its proposal, without solicitation or requirement, voluntarily stated that it possessed “ full knowledge of the kind, quantity, and quality of the work required,” and agreed to do the work for 16J cents per cubic yard, when the estimate of cost prepared by the engineers ran from 26 cents, for the lower, to 32 cents for the upper reaches of the area, and no other bidder had submitted a figure less than 22 cents.
Fraud and misrepresentation is frequently difficult to prove, but in this class of cases, wherein it most generally is to be deduced from printed documents, maps, and blue prints, and the influential effect of the same upon bidders, the conclusion as to its existence or nonexistence is not quite so involved as the reconciliation and analysis of oral testimony, keeping in mind, of course, that we are speaking of constructive rather than actual and intended deceit. However, the rule is not to be relaxed. The court must not only find the representations to have been false, but, being so, did actually mislead the bidder who obtained the contract. Christie, v. United States, sufra.
The burden of proving misrepresentation rests upon the party making the allegation. It is not to be presumed, and one may not, either under the Christie or Hollerbach case, simply show a different condition in some respects from that which the chart or blue prints of borings discloses, and rest his case upon the theory that the court must infer a mis *684 representation. There must be some degree oí culpability attached to the makers of the maps and charts, either that they were knowingly untrue or were prepared as the result of such a serious and egregious error that the court may imply bad faith. The many contract cases in this court, too many to cite, sustain this principle.
The plaintiff had in its employ as manager and superintendent of its dredging plant Mr. John A. Seeley, an exceedingly competent man. Mr. Seeley made the estimate upon which the company made its bid, and had entire charge of the dredging operations. Mr. Seeley had been for 11 years engaged in dredging over this identical area; he was thoroughly familiar with all local conditions, and while he had not dredged a channel deeper than 12 feet over this same course, he had completed one to that depth, and in so doing it is incredible that he was unfamiliar with the common character of the material to be dredged. Doubtless it was he who wrote into the plaintiff’s proposal that the company was familiar “ with the kind, quantity, and quality of the work required.” Was Seeley, and thereby the plaintiff, deceived by the blue pxúnts? It might well be argued that one of his long experience would not commit the monumental blunder of doing the work called for at such a reduced price unless he was misled as to the character of the material to be removed and the difficulties to be apprehended in performing the contract. The force of such a contention is effectually dispelled when Seeley’s relation to the contract and those interested in the venture, as shown by the record, discloses itself. The origin and organization of the plaintiff company and its affiliation with the Newark Meadows Improvement Co. is fully set forth in Finding VI. The ownership of the two companies was identical, and it was the indisputable purpose and intention, as a part of a large and important enterprise, to secure this contract — hence the obviously low bid — in order to secure a sufficient quantity of material to fill in and fill up a large area — about 3,500 acres — of swamp lands adjoining the lower reaches of the area to be dredged, acquired by the Newark Meadows Improvement Co., and at *685 the time practically worthless unless filled in. It is true the Newark Meadows Improvement Co. agreed to pay 10 cents per cubic yard for the material furnished, but this was in the end more apparent than real. As a matter of fact, proven and not seriously disputed, the enterprise as a whole resulted in immense profits, as shown in Finding X, notwithstanding the dredging contract was performed to the date of abandonment at a serious loss There was nothing wrong in this transaction, and there is no purpose to ascribe any irregularity to it. The parties had a perfect right to undertake it; nevertheless, it is a most potent factor in the determination of the issue as to being misled by the representations of the Government. It seems hardly possible to conclude that Seeley was misled as to local conditions, about which he knew as much as the Government officers. As to the borings themselves, the way employed to make them, appears in Finding IV. It was not unusual. The character of material dredged within the limits of the borings shown on blue print No. 1 is not complained of, except when included in the general average to make up the full percentage of alleged errors. The bor-ings in this stretch of 2.2 miles show “ mud, mud and sand, mud and shells, sand and gravel,” and yet the 10-day reports exhibit a strata of clay along the entire area. Clay is shown along with the above materials, in some instances hard enough to put the pumps of the plaintiff out of commission, and no complaint of any kind or character was lodged with the defendant respecting work in this area. On the other hand, it was done in a most expeditious manner, the quantities dredged being far in excess of the amounts required under the contract, and the same situation obtained as to operations under the second blue print, except that the borings covering this section of 3.1 miles did show the presence of clay. It was not until the plaintiff company had completed fully, or very nearly so, two-thirds of the work, that complaint was made, over five years after it had begun work, and at a time when it became more expensive to operate because so far away from a dumping base. It matters not, in so far as the performance *686 of the contract work is concerned, what was the character of the soil in the first two areas dredged. Surely there was no misrepresentation as to these two areas, for the plaintiff company found the work easy and progress rapid. It claims, and justly so, great credit for efficiency in this respect. It was not until after a very considerable portion of the' work embraced in the third area shown on blue print 3 was done that the plaintiff disavowed the accuracy of the blue prints and entered its protest, an area more than 5 miles from the area already dredged, a considerable dis-tancíe away from the Newark Meadows Improvement Co.’s land, and an area manifestly more expensive to dredge because farther away from the place of deposit.
There is no proof here that the borings did not show exactly what the officers taking them found. While they may not have shown clay as present at each point where the boring were made, they do disclose the presence of clay where clay was found, and in addition show clay present at a sufficient number of places to put the contractor on notice of its presence in the bottom of the channel, and thereby warn him of difficulties to be anticipated. It is not disputed, and may not be, that whenever the steel rod ran upon a bowlder the fact was recorded and the boring apparatus moved to another place for another boring. The record confirms the statement that the material dredged conformed generally to the material indicated by the borings, and no more could be done and no more is required. The facts are totally unlike the record in the Christie case. In the latter case bor-ings were made, and if a log was encountei'ed the officer moved the boring apparatus to a point free from logs and then recorded it as having been made at exactly the point where the log was found, thus leading the contractor to believe that no logs had appeared at this point, when, as a matter of fact, the log was there; had been found but not recorded at all. There can be no misrepresentation in bor-ings recorded as in this case where the record shows beyond doubt that what the borings indicate was correctly and honestly stated on the boring sheets. It would be difficult, even under circumstances a little more favorable to the plaintiff, *687 to hold that an actual mispresentation as to the borings was in all respects the moving and primary cause of plaintiff’s refusal to proceed with the contract. The plaintiff undertook the work at too low a figure, profits were being absorbed, and it was losing money. The contract was growing in burdensomeness, and the plaintiff found it impracticable, although it might have done so, to longer pump its dredged material on the Newark Meadows Improvement Co.’s lands. The plaintiff’s plant was allowed to deteriorate and an accumulating variety of discouraging factors faced the plaintiff if it continued to operate as it had done before. The motive to seize upon most any cause for discontinuance was present.
The plaintiff is suing only for the retained percentages and underpayment, and while it seeks to justify .its procedure and positively disclaims any intent to an actual voluntary abandonment of its contract, and charges the defendant with a breach thereof, no claim is made for damages other than as stated above. This claim we believe to be untenable. The findings show the true state of facts as we view them from the record, with respect to the underpayment claim, and we do not think it necessary to further discuss this item of the claim. It does appear from the evidence that the plaintiff was paid for all the material he was entitled to be paid for under the contract.
It is somewhat doubtful, in view of the facts, whether this suit may be maintained at all under the present status of the corporation. The testimony reveals the fact that before the plaintiff refused to proceed with the contract all stock in the corporation, including the dredging plant, was sold to Frank A. Barnaby for $1,000, including this claim. The charter of the company was forfeited for nonpayment of taxes and the facts incident thereto appear in Finding XII. It may be that the reorganization of the corporation and the election of officers was not in all respects legal. At any rate, there is not sufficient evidence in the record to hold otherwise. The defendant was content to rest the issue on this meager showing of fact, and we are not convinced that we would be warranted in dismissing the case *688 on. this issue alone. The allegations of the petition, not contradicted except as above, disclose the status of the plaintiff, and we have given the facts appearing of record as requested.
The petition will be dismissed. It is so ordered.
Graham, Judge; Hay, Judge; Downey, Judge; and Campbell, Chief Justice, concur.