Booth, Chief Justice,
delivered the opinion of the court:
Plaintiff is a Delaware corporation. March 27, 1931, plaintiff entered into the contract involved in this case. The contract obligated the plaintiff to furnish all labor and materials and perform the work essential to construct for -the United States a lock in the Kanawha River, opposite Marmet, in the State of West Virginia.
This suit is for the recovery of stated sums alleged to be •due the plaintiff for performing work which the contract -did not provide it should perform. Ten separate items are involved, and each exacts a discussion. Work under the -contract and on the premises was performed by the plaintiff prior to the time limit prescribed, and the plaintiff has received payments as provided in the contract and additional payments for extra work ordered thereunder.
TESTING STONET GATE VALVES
The contract required the plaintiff to construct and install six Stoney gate valves. Four such valves were to be installed in Lock A, the lock plaintiff was building, and two in Lock B which another contractor was building. The valves were to be operated by oil pressure and were connected with blades or gates and controlled when operated the filling and emptying of the lock chamber.
*237 Paragraph 130 of the specifications provided for a test of the valves after installation. This paragraph did not specifically state that the test was to be made by the use of oil pressure. It simply said, “they shall be raised and lowered to assure that the clearances specified on the drawings have been provided, and that the controlling devices are functioning properlyin other words, tested to ascertain if the valves would lower and raise the gates of the lock.
It is true paragraphs 131 and 139 of the specifications provide in detail for furnishing the necessary piping for oil in order to utilize it in operating the valves, but it is to be observed that the contractor was not to furnish and install piping for oil transmission to a point where an oil test could be made with respect to the two valves installed in iiock B. The contractor, it is admitted, did all that was required by the specifications with respect to the four valves installed in Lock A. These valves were subjected to an oil test and were satisfactory.
Notwithstanding the lack of facilities for oil testing the two valves in Lock B, and notwithstanding the success of the mechanical test of the same, the contracting officer exacted that an oil test of the same be made. The plaintiff protested against this exaction unless extra pay be allowed therefor. Some time in December 1931, after the work had heen performed, the contracting officer allowed the plaintiff :$895 for the piping, valves, and fittings furnished by plaintiff, plus a profit of ten percent, but declined to allow $20.85, the rental cost of an oil pump, and $192.17, the cost of labor incident to the same.
It is not contradicted that the cost to the plaintiff for doing this extra work is as stated in the record. The defense to this item is rested upon an alleged agreement between the parties providing that the defendant would pay for the materials to be furnished by the contractor plus, as stated, a profit of ten percent, the cost of labor incident to conducting the test to be borne by the contractor.
The issue resolves itself into a question of fact and the record upon this question is contradictory. The contractor was •obligated to observe paragraph 130 of the specifications *238 (Finding 6). This paragraph does not expressly call for an oil test of the valves, unless an inference follows from the general words “the controlling devices are functioning properly.” However, it is indisputable that no contractual obligation was imposed upon the contractor to conduct an oil test of the valves installed in Lock B. The oil test made by the contractor of the valves in Lock B was made upon the order of the defendant and for its benefit, and from the record the defendant, recognizing its own omission to provide specifications to cover the same, did in this instance fail to pay the full amount due the contractor, and a judgment for $213.02. will be awarded.
PREPARING GIRDERS POR ENAMELING
Findings T, 8, and 9 are amply supported by the recorcl. The error in the specifications with respect to the painting of the large steel box girders did not occasion the plaintiff any monetary loss, and, in addition to this fact, the plaintiff' agreed to the arrangement suggested by the defendant whereby the defendant was to accept the girders painted as the specifications provided instead of exacting that they be-painted in another way.
The plaintiff is in no position to raise an issue as to what it terms a cancellation of the specifications which required the furnishing of the girders. It is true the contractng officer did notify the plaintiff that the girders would not be required,, and subsequently changed his mind and ordered that they be furnished. The plaintiff did not protest this proceeding but acquiesced and proceeded to promptly meet the specifications. We do not mean to imply that a protest would have had the. effect of giving rise to a cause of action; we recite the fact as. additional evidence that the plaintiff acquiesced in what was done. No additional or extra work resulted from the order..
FURNISHING STEEL CASTINGS
The specifications required the plaintiff to furnish steel castings and they were furnished. The controversy over this: item is as to payment for the same. The castings were to be-embedded in the cement walls of the lock chamber. They *239 functioned to prevent injury to the walls by the vessels passing through, and to a limited extent prevented injury to the vessels themselves. Due to the number of castings to be furnished, it was impracticable to have their weight ascertained on the site of the work.
The specifications provided as follows:
Unless otherwise authorized by the contracting officer, each casting shall be within 7y2 per cent of the theoretical weight as calculated from the drawings. [Italics inserted.]
Obviously this provision has nothing to do with fixing payment for the castings except in an indirect way, as will appear. The provision deals expressly with the weight exacted for each casting. It is stated that the contractor was to be paid at the rate of 5y2 cents a pound, after the total weight of all the castings was ascertained.
The plaintiff then, in order to ascertain weight, must resort, as the specifications direct, to the drawings which in this instance become part of the contract. No other method was available and none has been suggested in briefs or argument. Therefore, the solution of this issue depends upon the drawings for the weight of each casting; the specification is not involved.
We have said that all the castings were to be embedded in the walls of the lock chamber. In order to successfully accomplish this, the castings had to be fabricated with what are termed “core holes.” The castings to be embedded had to be attached to wooden frames into which concrete- was poured, and the “core holes,” i. e., nothing more than ordinary holes, enabled workmen to attach them by inserting anchor pins into the holes and the wooden frames.
When the concrete set and the wooden frames were removed, the anchor pins, of course, were removed and the casting remained a solid portion of the walls of the lock chamber. There is nothing on the drawings previously referred to or in the computations of weight attached which shows in any way that in ascertaining the technical weight of the castings these core holes were to be excluded and the-volume reduced to this extent.
*240 The plaintiff diligently sought from the defendant its method of ascertaining the weight of the castings for payment purposes, and the defendant by a written offer advised the plaintiff that they would be paid for upon the basis of shipping weights at the point of manufacture as certified by the Government inspector, and payments were made upon this basis until some time in July. The defendant subsequent to this date for the first time resorted to a theoretical computation of weights and deducted the “core holes” and thereby reduced to the extent of the deduction the volume of the steel to be furnished. This had the effect of reducing the payments for the castings in the amount plaintiff now claims.
Theoretical weights are arrived at by computing the net volume of a casting and multiplying that net volume by a unit weight, depending upon the specific gravity of the material used (Finding 12). The defendant’s officials followed this established formula except they reduced the net volume of the castings to the extent of the holes. It is said: “the core holes weighed nothing, but do take up room.” The plaintiff’s calculation made no allowance for the holes. It may be that it is good engineering practice to follow the defendant’s course. However, we are to look to the contract and specifications; they govern in this instance.
It is contended that plaintiff’s computation, irrespective of the core holes, is inaccurate because “not made with the degree of refinement” which characterizes the defendant’s. The degree of refinement relied upon is predicated upon an alleged neglect of the plaintiff’s engineer to take into consideration the contour of the castings and their precise area in ascertaining volume. The plaintiff’s computation was made from the drawings which exhibited in detail the castings required. The plaintiff was required to furnish them in accord with the drawings, and it did so. The defendant’s computation was not made until after the contract work had been completed, and an addendum was made as late as May 28, 1935, on which date the weight of the castings was reduced from 359.32 to 357.71 lbs.
We think the contractor observed the specifications and drawings, and although the difference between the parties *241 is comparatively insignificant, the belated change in the method of computation was obviously induced by the' erroneous impression upon the part of the defendant that without the changed computation plaintiff was being paid a larger sum for furnishing the castings than the contract provided. As a matter of fact, the steel furnished by the contractor exceeded in actual weight much more in poundage than the plaintiff may be paid for under the technical computation. Judgment will be awarded for this item in the sum of $572.96.
MAINTAINING PUMPING PLANT
The plaintiff’s contention involving the extra cost of maintaining the pumping plant is without merit. Finding 15 reflects the record accurately. Subsequent to directing the plaintiff to build a concrete apron at the lower end of the locks, the defendant allowed and paid the plaintiff $11,348.88 for this admittedly extra work. In building the apron the plaintiff had to provide two sub-cofferdams within the limits of its main cofferdam and the area was kept unwatered by pumps. What the plaintiff complains about is that this fact, coupled with the performance of the work involved in building the concrete apron, increased to the extent of $300 the cost of maintaining its main pumping plant. In other words, the decision to have the concrete apron built prolonged the period of time required to maintain its main pumping plant. The sum asked is conjectural and the record does not sustain a finding that any appreciable loss of time was caused thereby.
ANCHORING COFFERDAM
This item is to be decided upon facts. The main cofferdam to be constructed by the plaintiff in its upper arm had to be anchored or extended into the bank of the river. An adjacent landowner complained to both the plaintiff and defendant that the use of his land for the purpose of driving trucks over it and dumping materials thereon, or in other ways, was unauthorized. The defendant claimed the right to anchor the arm of the cofferdam and declined to *242 pay the landowner any sum. The plaintiff, however, entered into a contract with him and agreed to pay him $75, which was done. Obviously, the plaintiff has no claim for reimbursement. No obligation existed upon the part of the plaintiff to pay the sum.
EXCESS CEMENT
It is not denied that the plaintiff mixed and poured 28,935 batches of concrete in order to produce a sufficient amount to meet the requirements of the contract. If the batches as mixed had produced a perfect yield, 47,890 cubic yards of concrete would have been the result. The actual amount of concrete computed for the work was 47,626.7 cubic yards. The plaintiff consented to a deduction of 81 cubic yards and was paid for 47,545.7 cubic yards.
The claim under this item is predicated upon an alleged excessive use of cement, made necessary by defendant’s order, over what would have actually been required to produce sufficient concrete to' meet the requirements of the contract. In other words, it is asserted that the defendant exacted of plaintiff the use of a greater amount of cement to produce concrete than should have been exacted.
Findings 18 and 19 are supported by the record. The solution of the controversy depends upon the facts. The proportions of materials entering into the production of the concrete were amicably agreed upon. It was thought that the formula accepted would produce two cubic yards from each unit mixture. Theoretically a perfect result is not generally obtainable. Variations occur, in some instances decreasing, and in others increasing, the result. The general result obtained in this instance was satisfactory and the formulas prescribed for making the mixture indicate the usual degree of accuracy.
The plaintiff contends that it was demonstrated as a fact that the ratio of cement, sand, and gravel prescribed was not sufficient to produce two cubic yards per batch, and that because of this fact more cement was required, whereas additional sand and gravel should have been added as re *243 quested instead of cement. The difficulty with this contention is that the first batch produced resulted in a mixture within about two percent of perfect, and that in the end the formula followed was approximately 99.5 perfect.
Paragraph 51 of the specifications provided as follows:
51. Proportioning, (a) Method. — All classes of concrete shall be proportioned by the water-cement ratio method.
(b) Control. — The exact proportions of all materials entering into the concrete shall be determined by the contractor at frequent intervals as directed by the contracting officer. The contractor shall provide all equipment necessary to positively determine and control the relative amounts of the various materials. The proportions shall be changed whenever necessary to obtain the specified strength and workability, and the contractor shall not be compensated because of such changes.
(c) Cement content. — Each cubic yard of concrete shall contain not less than 5 bags of cement.
The findings preclude a judgment for the amount asked.
construction of cribs and monoliths
The plaintiff contends that a proper construction of the plans and specifications concerned with payments for the construction and maintenance of a cofferdam entitle it to a judgment for $5,937.50. Contest over the correctness of the findings involving this item is not to any extent available. Findings 21 and 22 reflect the facts.
Paragraph 23 of the specifications discloses the fact that the cofferdam was to be paid for “on the basis of the number of linear feet of masonry in the lock and the lower guard wall.” Assuredly this provision is clear. In addition, the specification states the number of linear feet involved, i. e., “935 linear feet.” Precisely 935 linear feet of masonry made up the lock and lower guard walls, and the plaintiff was paid for the cofferdams accordingly. About this fact no dispute exists.
The upper guard wall of the lock was to be constructed without a cofferdam. This specification, like the foregoing one, is explicit. A cofferdam of the box type was essential, *244 and the defendant reserved the right to have it removed or to acquire same from the plaintiff and allow it to remain in place. The specifications cautioned the plaintiff to estimate the cost of building, maintaining, or removing the same in view of the above option of the defendant.
The plaintiff did not elect to construct the upper guard wall until after the cofferdam had been completed and in place. This resulted in compelling the plaintiff to construct within the cofferdam 47.5 feet of masonry in order to build a part of the upper guard wall. It is now claimed that this had the effect of increasing the linear feet of masonry within the limits of the cofferdam from 935 to 982.5 feet and increased by $5,937.50 the amount the plaintiff was paid under the specifications.
It is true the specifications notified the plaintiff that the amount bid for the construction and maintenance of the cofferdam “should be based on the assumption that the cofferdam will be removed,” an unusual specification when considered along with the reservation upon the part of the defendant to acquire the same. Nevertheless this fact does not have the effect of negativing the positive one that the upper guard wall was to be constructed without a cofferdam.
The record discloses no compulsion upon the part of the defendant to restrain or require the plaintiff to pursue the course taken. Plaintiff was free to make a choice and was warned that to construct the upper guard wall within the cofferdam would not increase payments due under the contract and specifications. The plaintiff’s engineer was a competent one. Work under contracts and specifications was not new to plaintiff, and it is difficult to perceive upon what basis in fact or law this item is claimed. It can not be allowed.
ERECTING NEW COFFERDAM
The loss claimed for the erection of a new cofferdam is as a matter of fact the outgrowth of the construction of the first cofferdam. It is not essential to discuss the claim in detail. What has already been said is sufficient. It is manifest from the record that the plaintiff should have anticipated the sit *245 uation which finally culminated in the extra cost of constructing the upper guard wall. The contract and specifications •granted the defendant a right not limited in any way except by the dates stated in the contract to acquire the old cofferdam.
Contract provisions are not susceptible to modification or -change when they expressly state what may be done thereunder and the method and procedure for making changes. This principle of law is fundamental. The record does not sustain a contention that plaintiff could not possibly observe the provisions of the specifications, and if a choice obtained to do the work in one way or another the contractor may not recover because the most expensive way was adopted. We do not allow recovery.
COST or EMBEDDED TIMBERS
Paragraph 61 of the specifications provided the basis of measurement for payment for concrete. A portion of this paragraph is as follows:
In measuring concrete for payment no deductions will be made for rounded or beveled edges or spaces' occupied by metal work, or for voids less than 5 cubic feet in volume or less than 1 square foot in cross section. The price bid for concrete shall include all materials, forms, tie-rods, expansion joints, cement testing, and all incidental work.
The record is clear that in the construction of the upper guard wall of the lock crib timbers used in the construction of the same were embedded in concrete. It is also not to be denied that what was done came squarely within the specification quoted above. The defendant refused to include the area occupied by the embedded materials, an area of 98.08 cubic yards, in measuring the concrete for payment on the ground that timber rather than metal was involved. . This construction of the specifications is unwarranted. The void was less than 5 cubic feet in volume and as such was to be included in concrete measurement. The plaintiff in constructing the upper guard wall was compelled by the specifications to resort to crib timber in so doing and the crib timbers extended *246 into the concrete and were encased therein. The Chief of Engineers recommended payment of this item and we think it-is recoverable. The sum of $784.64 will be included in the judgment of the court.
COST OF CRIB TIMBERS
Finding 26 states the facts. In the computation of the amount of board feet required to construct the crib timber used in the construction of the upper guard wall the difference between the parties is so> insignificant that proof as to error upon the part of the defendant has not been adduced. The amount claimed, $44.10, will not be allowed.
grouting and preparing rock surfaces
The parties to this suit disclose a wide difference of conviction as to the facts relevant to the plaintiff’s claim under this item. The contract work involved has to do with the preliminary preparations for the construction of the foundations of the lock. A portion of paragraph 24 of the specifications reads as follows:
All rock surfaces for foundations must be freed from loose pieces and worked down to a firm, solid bed of suitable form satisfactory to the contracting officer.
The defendant decided soon after the plaintiff began work to have the plaintiff perform additional work not provided for in the specifications, i. e., the grouting of the foundations under the lock wall. A proper order was issued for' this additional work; plaintiff accepted- it, and, when concluded, was paid $15,677.79 for performing the same.
Grouting the foundations, as it is called, consisted of drilling holes into the rock foundations and forcing into the same liquid concrete. This was done “to solidify the foundation rock on which the walls were to rest and also to reduce the amount of seepage under and through the foundations.” When this was. completed the rock surfaces under which the grouting work was done were to be prepared to receive concrete.
*247 Paragraph 53 of the specifications is in part as follows:
(b) Placing. — Concrete shall be placed as soon as practicable after oiling the forms and before initial set has occurred, and in no event after it has contained its water content for more than thirty (30) minutes. Unless otherwise specified, all concrete shall be placed in the dry upon clean, damp surfaces, free from running water, and never upon soft mud, ary porous earth or frozen earth, or upon fills that have not been subjected to approved puddling or tamping so that ultimate settlement has occurred. * * *
The plaintiff encountered difficulty both in the preparation of the rock surfaces to receive concrete and in placing concrete. Water came into the foundation area in such quantities as to impose upon the plaintiff cost and expense it had not contemplated in the performance of the work. Plaintiff experienced much trouble and incurred added expense in making the rock surface sufficiently dry to receive the concrete.
Plaintiff seeks a judgment for the sum of $5,800, insisting first: that the flow of water encountered was occasioned by misleading representations made by the defendant’s official as to subsurface conditions, it being contended that the defendant’s drawing available to plaintiff “indicated sound solid limestone above the points where the monoliths were to rest,” whereas as a matter of fact the subaqueous rock found was laminated and water-bearing and was in fact the source of the unusual quantity of water encountered.
Plaintiff’s second contention upon this item is that because of the absence of any warning as to exact subsurface conditions — a fact, it is said, the defendant knew — plaintiff was obliged to do a large amount of extra drilling and grouting for which no payment has been made, and further, as a consequence of the misleading drawings, plaintiff was required to perform a large amount of extra and expensive work in preparing the rock surfaces for the receipt of concrete.
A misrepresentation of the character of the one relied upon by plaintiff must be one that actually misleads the party aggrieved, and in this instance the record does not warrant a holding to that effect. Christie v. United States, 237 U. S. 234; Hollerbach v. United States, 233 U. S. 165. *248 The specifications contained these two pertinent and important paragraphs:
From surveys and borings made- at the site it is assumed that conditions will be found approximately as indicated on the drawings, but bidders are advised to make their own investigations and estimates and to prepare their bids accordingly.
Samples of core borings at the lock site are on hand at IT. iS. Engineer Field Office, Lock No. 5, Kanawha River, Marmet, W. Va., where they may be seen by prospective bidders. Bidders are advised to examine the cores and to judge for themselves the character of materials to be encountered.
It is admitted that the plaintiff did not make any investigation of its own. It is also conceded that plaintiff examined the surveys but did not examine samples of borings made by the defendant, and while the drawings did not disclose “a seamy, laminated, or broken condition,” the borings did. We have no record showing that the drawings were false so far as they went. There is no proof of record that any official of defendant registered a condition, as disclosed by a boring, that was false. In order to sustain misrepresentation it must be proven that the defendant’s official made a boring and found a certain condition and did not register exactly what was found, but, on the contrary, registered a different condition from what the boring showed.
The plaintiff from the record was at fault. Subsurface conditions foreseeable only from tests, borings, and surveys, were designated by the specifications, so far as the defendant explored the situation, as precarious. The defendant did not warrant their accuracy, and in the absence of positive and convincing proof of misrepresentation we can not imply its existence. As a matter of proven fact, it is evident that more than one source existed from which water and seepage came. The item will not be, included in the judgment.
Judgment will be awarded the plaintiff for the total sum of $1,570.62. It is so ordered.
Whaley, Judge; Littleton, Judge; and Green, Judge, concur.
Williams, Judge, took no part in the decision of this case.