FLIPPIN MATERIALS COMPANY, a Joint Venture Composed of Brown and Root, Inc., a Corporation, et al.

v.

The UNITED STATES.

No. 8–57.

United States Court of Claims.

Jan. 11, 1963.

Rehearing Denied April 5, 1963.

---

John W. Gaskins, Washington, D. C., for plaintiff. Paul E. McNulty and King & King, Washington, D. C., were on the briefs.

Edward L. Metzler, Washington, D. C., with whom was Acting Asst. Atty. Gen., Joseph D. Guilfoyle, for defendant.

DAVIS, Judge.

The plaintiff is a joint venture—comprising the same nine large construction enterprises which were building the Bull Shoals Dam for the Government in Arkansas (see Ozark Dam Constructors v. United States, Ct.Cl., decided April 7, 1961, 288 F.2d 913)—which was formed for the sole purpose of contracting with the Government to manufacture sand and crushed rock (called "aggregate") from limestone found in a government-owned mountain (Lee Mountain) near the Bull Shoals area and to deliver this aggregate to the dam site for use in the concrete required for the Bull Shoals Dam. The work was to be done at specified unit prices per ton of material, and estimated quantities were set forth in the contract. The main issue before us arises out of the plaintiff's claim that the defendant misrepresented the nature of the material embedded in Lee Mountain, with the result that plaintiff was forced to do much additional work to find and extract usable crushed rock for the aggregate to be deposited at Bull Shoals. Defendant denies any misrepresentation and asserts that plaintiff possessed all the requisite information or had it readily available.

Commissioner Bennett has filed a comprehensive report of 52 pages, dealing with all the factual aspects of plaintiff's claim. The parties have elaborately challenged major portions of those findings, and each repulses the assaults made by the other. We have been favored by a massive amount of argumentation.[1] However, we are fortunately spared from delving into these voluminous attacks in depth on the 79 detailed findings; for us the primary issue can be adequately resolved on the basis of a relatively narrow segment of the evidence. Accordingly, we do not pass upon the various challenges to the findings which are irrelevant to our disposition of the case; instead we accept arguendo the Commissioner's findings on those points, making it clear that we have reviewed only those challenged findings which are critical to our decision (as indicated in this opinion).

Under its contract plaintiff was to dig into Lee Mountain, extract large amounts of rock, crush the rock and form aggregate, and transport the aggregate to Bull Shoals. For coarse aggregate plaintiff was to be paid $2.41 a ton, and the estimate was that 2,700,000 tons would be extracted. For fine aggregate the ton price was $2.54, and the estimate was 1,100,000 tons. Plaintiff was also to be paid $.30 per cubic yard for waste material stripped or scalped from above or around the rock formations; it is agreed, however, that the price of $.30 is less than the actual unit cost of such removal, and was inserted by the defendant in the contract in order to keep waste material to a minimum.[2]

A major consideration in bidding on quarrying work of this kind is the nature of the material underlying the surface of the quarrying area. Limestone is a good source of rock for aggregate, and it was known to be there. But limestone

1. Plaintiff's exceptions to the findings total 87 printed pages, and it answers the defendant's exceptions in an additional 152 printed pages; the plaintiff's briefs total 137 further printed pages. Defendant's exceptions to the findings mount to 281 mimeographed pages; it answers plaintiff's exceptions in the course of its own exceptions as well as in its brief of 169 mimeographed pages. The total argumentation is 826 pages. Copious references are also made to the findings requested from the Commissioner.

2. Plaintiff's unit bid prices on aggregates were increased to make up for the anticipated loss on wasted material.

is also a soluble rock commonly possessing cavities as a result of the chemical action of water upon the stone in past eras. If these cavities are empty or filled (partially or wholly) with sand, the job is a normal one since sand does not hinder the breaking up of limestone for the aggregate which is the end-product of the quarrying; but if these limestone cavities are filled with clay, unusable for aggregate and contaminating the rock, there is much additional material to be stripped or scalped, and then wasted, in the course of finding and separating rock untainted by clay.

Plaintiff found much more clay-contaminated rock than (it now says) it expected or was led to expect, and was therefore required to remove much more waste material.[3] It also says that because of the clay it was forced to change from an operation at the side of the mountain to a more difficult and expensive one at the crest. Its claim is that it did not know and was not told of the probable extent and areas of the clay in Lee Mountain, but that defendant did have the information (from its pre-contract test borings) which it failed to reveal to the plaintiff, as it should have. The result, plaintiff charges, is that it expended over $600,000 in extra removal of waste materials for which it has not received recompense. The short of our decision rejecting the claim is that, assuming that plaintiff was in fact as innocent as it says of the nature and scope of the clay pockets in the mountain, still the Government's information was available to it and under its contract it was bound to seek that information or to be treated as if it had.

Before the contract was executed, the defendant drilled 33 holes in the mountain to ascertain the character of the underlying material. The defendant then supplied the plaintiff drawings of the profiles (or logs) of these borings, which showed cavities in the limestone formation by solid black markings; there was no statement, however, whether the cavities were open or wholly or partially filled by clay. The actual cores of the borings were retained and were available to, and inspected by, plaintiff. Although defendant vigorously attacks the findings on this aspect of the case, we accept for the purposes of our decision (without deciding or independently finding) the Commissioner's conclusion that, on the basis of these contract drawings and core-borings (which it admittedly examined) as well as the other facts of which it was aware, plaintiff did not know or have reason to know that such a large part of the subsurface material in Lee Mountain was contaminated with clay (see findings 10, 11, 12, 13, 19, 20, 21, 25, 45 and 51).[4]

Our problem centers on the fact that the defendant also had field logs, recording the actual findings of the inspectors and geologists, which contained considerably more information than was shown on the contract drawings; from these field logs it is indisputable that it could readily be ascertained that a great many of the cavities shown in the contract drawings were clay-filled. The Commissioner has found as fact, and on a review of the evidence we affirmatively agree, that it was customary to make such field logs; that this was known to plaintiff,

3. Plaintiff insists that it anticipated about 1,000,000 cubic yards of stripped and scalped material. It actually removed 2,763,067 cubic yards. The contract did not give any estimate as to the probable amount of material to be stripped, scalped and wasted.

4. A prime reason why it was not alerted by the contract drawings, plaintiff asserts, is that the comparable drawings for the earlier Bull Shoals and Norfolk Dam projects, with which the joint venturers

were familiar, specifically designated clay-filled cavities as such, or warned that "open" cavities (shown by solid black symbols) probably had a soft clay filling (see findings 11, 12). As already indicated, the contract drawings for the quarry in Lee Mountain, while indicating cavities, did not say or suggest whether the cavities were open, clay-filled, or partially clay-filled. The defendant says that these differences in the treatment of cavities should have stimulated plaintiff to further inquiry.

composed as it was of businesses experienced in heavy construction; that the field logs were kept at the Corps of Engineers' field office where the actual boring-cores were on display and inspected by plaintiff's representatives; that had plaintiff asked to see these logs they would have been permitted to do so (although defendant would have disclaimed any responsibility for plaintiff's reliance on the contents of the logs); and that the field logs, which distinguished between open cavities and those containing clay, revealed that very large parts of the cavities encountered in the borings and shown on the contract drawings were filled to some extent with clay.

Was plaintiff bound to ask for these field logs located in the nearby Government field office? At a pre-bid conference, plaintiff was informed in writing that "[r]esults of explorations and tests, including core from some of the borings, are available at the Bull Shoals suboffice, Mountain Home, Arkansas." Section SC–12 of the contract specifications similarly provided that the "results of all borings and tests, including samples of core, which have been made by the Government, of the materials contemplated for use under these specifications are available at the Bull Shoals suboffice, Mountain Home, Arkansas, for examination by the bidders." [5] The contract also contained the usual warning and exculpatory provisions requiring the contractor to investigate conditions for itself (including the "character, quality and quantity of surface and subsurface materials to be encountered") and providing that "any failure by the contractor to acquaint [itself] with all the available information concerning these conditions will not relieve [it] from responsibility for estimating properly the difficulty or cost of successfully performing the work" (see finding 6). Significantly, the contract contained no clause relating to changed sub-surface conditions.

We have concluded that this general phrase "results of all borings and tests, including samples of core"—appearing in the specifications—covered the field logs, and therefore that plaintiff is charged with notice of the information appearing in those documents. Plaintiff knew, as we have found (finding 17), that it was customary to make field logs. From the experience of the joint venturers with the Norfolk and Bull Shoals projects, the plaintiff also knew that the Little Rock District Engineer Office had previously made such logs available and had described them as "logs of these explorations", "logs of the core borings", "records of the drilling, "logs of individual test holes", or "logs of borings." These terms are very close to the somewhat broader phrase used in the present contract, and it is natural to read the new phrase as having at least the coverage of the old. The contract drawings, or contract logs as they have sometimes been called, were already furnished to plaintiff, and therefore could not have been the "results of all borings and tests" which were to be made available on request. The actual physical cores were certainly within that designation, but they could not have been the only materials meant to be covered since the specification expressly declared that they were *included* within the wider term "results of all borings and tests", or the phrase "results of explorations and tests" (as the pre-bid information bulletin put it).[6] Some additional information relating to

5. The Commissioner has found, and we assume *arguendo*, that no more specific reference was made to the field logs by the Government's representatives at pre-bid conferences or interviews or during the negotiations, and that they were not seen by the plaintiff until after the work was completed.

6. The defendant points out that the physical cores for Hole No. 1 had been shipped to Vicksburg for testing and were not available at the Bull Shoals Suboffice. For that hole, the main "results of all borings and tests" available at the suboffice would be the field logs.

Plaintiff emphasizes that the field logs were not shown to any bidder, but we do not find this important since only two bids were received by the Government on the Lee Mountain project.

the test borings was undoubtedly included. Plaintiff's evidence is that the only extra materials it understood the phrase to cover were laboratory reports on the rock to determine its acceptability, but a Government witness testified specifically that the phrase also included, and was understood as including, the field logs. Particularly in the light of the general contractual clauses counseling the contractor "to acquaint himself with all the available information" concerning the conditions to be encountered (including "the character, quality and quantity of surface and subsurface materials"), it is fair to read "results of all borings and tests" broadly rather than narrowly.[7]

Giving weight to all of these elements, we believe the correct interpretation of the inclusive words, "results of all borings and tests", is that they encompass the field logs which were customarily made in order to report on test borings, which had been specifically available on the earlier companion projects in which the plaintiff's parents had participated, and which would have been made available here on request. Accordingly, the plaintiff was told by the contract, properly read, where it could obtain from the Government the very information which it says was withheld to its detriment.

Even so, plaintiff urges, the defendant is liable because a contractor is entitled to rely on definitive representations in the contract papers themselves, such as the contract drawings in this case, and is not required to search further for the true facts. The cases do hold that the Government is liable for damage attributable to misstatements of fact (in a contract or specifications) which are representations made to the contractor.[8] The cases also hold that, in such circumstances, the defendant is not relieved from liability by general contractual provisions requiring the bidder to investigate the site or satisfy himself of conditions, or stating that the United States does not guarantee the statements of fact in the specifications, etc.[9] But the cases do *not* hold that a bidder can rely on some portion of the information supplied by the Government without looking at other Government materials (to which he is directed by the contract documents themselves) which qualify, expand, or explain the particular segment of information on which the contractor intends to rely. The offer of the "results of all borings and tests", i. e., the field logs, was as much a part of the contract papers as the profile drawings of the holes which had been bored. In this context as well as others, "the court is required to examine the entire contract * * *." United States v. Utah, Nevada & California Stage Company, 199 U.S. 414, 423, 26 S.Ct. 69, 72, 50 L.Ed. 251 (1905).

---

**7.** Although general warnings to visit the site or become acquainted with all information, etc., will not excuse an affirmative misrepresentation by defendant, see footnotes 8–9, infra, such general warnings cannot be disregarded and must be taken into account in interpreting the specifications and deciding whether there was in fact a misrepresentation. See Blauner Construction Co. v. United States, 94 Ct.Cl. 503 (1941); C. W. Blakeslee & Sons, Inc. v. United States, 89 Ct.Cl. 226, 250 (1939), cert. denied, 309 U.S. 659, 60 S.Ct. 512, 84 L.Ed. 1007 (1940); Archie & Allan Spiers, Inc. v. United States, Ct.Cl., decided Dec. 6, 1961, 296 F.2d 757.

**8.** See, e. g., Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); United States v. Spearin, 248 U.S. 132, 136, 39 S.Ct. 59, 63 L.Ed. 166 (1918); United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920); United States v. L. P. & J. A. Smith, 256 U.S. 11, 41 S.Ct. 413, 65 L.Ed. 808 (1921); Dunbar & Sullivan Dredging Co. v. United States, 65 Ct.Cl. 567 (1928); Levering & Garrigues Co. v. United States, 73 Ct.Cl. 566, 573–574 (1932); Arcole Midwest Corp. v. United States, 113 F.Supp. 278, 125 Ct. Cl. 818 (1953); Potashnick v. United States, 105 F.Supp. 837, 123 Ct.Cl. 197 (1952); Railroad Waterproofing Corp. v. United States, 137 F.Supp. 713, 133 Ct. Cl. 911 (1956).

**9.** See most of the cases cited in the preceding footnote.

Recognizing this principle, the court has refused recovery—in cases akin to the present one, although not precisely in point—to contractors who sought to rely on an alleged misrepresentation in one part of a contract even though they were guided by the contract documents to sources which would have revealed the whole truth. In General Contracting Corp. v. United States, 88 Ct.Cl. 214, 247 (1939), the contractor, who found rock which was laminated and water-bearing, claimed to have been misled because the Government drawings indicated "solid limestone"; however, the specifications advised bidders "to examine the cores and to judge for themselves the character of the materials to be encountered." The court denied recovery, saying that "while the drawings did not disclose a 'seamy, laminated, or broken condition', the borings did. 'We have no record showing that the drawings were false so far as they went." Similarly, in plaintiff's case, while the drawings did not indicate that the cavities were clay-filled, the field logs did, and the drawings, though incomplete, were not false "so far as they went"; the plaintiff was in effect told to look at the field logs for the full story. In C. W. Blakeslee & Sons, Inc. v. United States, 89 Ct.Cl. 226, 246–247 (1939), cert. denied, 309 U.S. 659, 60 S.Ct. 512, 84 L.Ed. 1007 (1940), the contractor charged that it was deceived by the wash-boring maps to believe that there were no significant boulders in the subsurface area; the contractor failed to consult the boring logs, which were available, and therefore did not gather, since it looked at the wash-boring maps alone, that boulders existed and dynamite was used to get by them. "The method of making the borings and the fact that dynamite was used and similar information is recorded in the log book. Plaintiffs knew this but made no effort to consult the log book, which was available to them. Plaintiffs therefore have no one but themselves to blame for the fact that at the time they submitted their bid they did not know that dynamite had been used by the defendant in making the borings and cannot be heard to complain that they were misled or damaged by the defendant because of that fact." In Archie & Allan Spiers, Inc. v. United States, Ct.Cl. decided Dec. 6, 1961, 296 F.2d 757, the contract warned the bidder to "verify all dimensions and conditions at the site"; these special warning clauses were held applicable to a contractor who failed to check the typical measurements shown on the drawings. See, also, Central Dredging Company, Inc. v. United States, 94 Ct.Cl. 1, 11, 13 (1941); Trimount Dredging Co. v. United States, 80 Ct.Cl. 559, 574–575 (1935); Nelson Construction Co. v. United States, 91 Ct.Cl. 476, 486 (1940), cert. denied, 312 U.S. 696, 61 S.Ct. 731, 85 L.Ed. 1131 (1941). In all of these cases, no doubt, there existed some other particular factor, in addition to the contractor's failure to seek information open to him under the contract, which entered into the court's ruling against the claim of misrepresentation, but we think the fair residue of the opinions is that a contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to bid. As we read them, the decisions of the Supreme Court and of this court do not permit the contractor to rest content with the materials physically furnished to him;[10] he must also refer to other materials which are available and about which he is told by the contract documents.

10. There have been a number of cases in which contractors were required to scan Government information beyond the confines of the contract documents. See United States v. Atlantic Dredging Co., 253 U.S. 1, 3, 10, 40 S.Ct. 423, 64 L.Ed. 735 (1920); Levering & Garrigues Co. v. United States, 73 Ct.Cl. 566, 573–574 (1932); General Contracting Corp. v. United States, 88 Ct.Cl. 214, 248 (1939); C. W. Blakeslee & Sons, Inc. v. United States, 89 Ct.Cl. 226, 246 (1939), cert. denied, 309 U.S. 659, 60 S.Ct. 512, 84 L.Ed. 1007 (1940); Puget Sound Bridge & Dredging Co. v. United States, 130 F.Supp. 368, 131 Ct.Cl. 490, 497 (1955).

That principle squarely applies here. If the Flippin contract had used the more explicit words of the Norfolk Dam or Bull Shoals Dam documents—"logs of individual test holes" or "the records of the drilling" may be seen at the District Engineer's Office—the plaintiff would certainly have been required to look at those records. As we have said, the comparable phrase "results of all borings and tests" has at least the same breadth in this case. Plaintiff was not excused from examining the logs because the Government's representatives would have disclaimed any responsibility, under the general contract provisions telling the contractor to investigate for itself, for plaintiff's reliance on the logs' contents; such oral observations, simply reiterating the standard clauses, could not affect the contractor's obligation to acquaint itself with the pertinent materials, or its rights if it was in fact misled by that information. Plaintiff has given us no persuasive reason for avoiding the consequences of its failure to ask for the field logs.

■ Belatedly, plaintiff argues, in the alternative, that, even if it cannot show misrepresentation, it is entitled to recover on the ground that both parties were mistaken as to the quantity of stripping and waste that would be encountered and the availability of a sufficient quantity of acceptable rock in a sidehill operation (rather than digging into the crest of Lee Mountain). Plaintiff estimated, it says, that 1,000,000 cubic yards of stripping and scalping material would be wasted; the defendant's pre-contract estimate of waste was 1,165,000 cubic yards; the actual amount wasted turned out to be 2,763,067 cubic yards. The Commissioner has also found —and for this decision we assume the correctness of these findings—that both parties originally contemplated a sidehill operation and that in the course of performance plaintiff changed (with defendant's approval) from a sidehill operation to an operation at the crest, because it believed that much more waste would result from continuing to work at the side. These facts do not warrant reformation of the contract for mutual mistake.

■■ There are many contract misapprehensions, common to both parties, which fall short of requiring reformation. See V Williston, Contracts (rev. ed.), Secs. 1538, et seq. In particular, a mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the risk of such a mistake on the party asking reformation (United States v. Hathaway, 242 F.2d 897 (C.A.9, 1957)), or normally if the other party, though made aware of the correct facts, would not have agreed at the outset to the change now sought (Williston, supra. Secs. 1547, 1548, 1549). Both of these conditions are present here. The elaborate contract provisions on "Site Investigation and Representations",[11] together with the

11. "GC-2 SITE INVESTIGATION AND REPRESENTATIONS.

"The contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, and roads, uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered, the character and equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the negotiation and execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is as-

omission of the usual changed conditions clause, show that the risks of mistakes as to subsurface materials were deliberately placed on the plaintiff; in the absence of misrepresentation, the contractor was to be bound by what he met during performance. United States v. Hathaway, supra, 242 F.2d at 899–901; American Elastics, Inc. v. United States, 187 F.2d 109, 112, 113 (C.A.2, 1951); see also footnote 7, supra. Moreover, there was no misunderstanding on the Government's part as to what plaintiff *might* have to do to fulfill the contract at the specified prices. As the Commissioner has found without dispute, the defendant contemplated a sidehill operation but did not require it or put another method out of mind (see findings 23, 25, 30, 35, 51);[12] and there is little reason to believe that, even if the Government had known in advance that 2,763,067 cubic yards of material would be wasted, it would have agreed to increase the plaintiff's compensation. Plaintiff's total bid price was considerably higher than the Government's estimate of total costs, and the defendant viewed plaintiff's bid as excessive. Agreement was ultimately reached through the adoption of a contract term (article 29) accepting plaintiff's bid prices but also providing that if those unit prices were higher than actual costs the difference would be divided equally between the parties. Despite the additional work for which it now sues, plaintiff admittedly made a substantial profit on the contract (see finding 57). Its total adjusted contract price amounted to $10,386,935.86; its "adjusted cost" (including all applicable contract expenses plus 2. per cent for home office overhead and 10 per cent profit) totaled $8,697,306.85. Its additional net income thus came to $1,689,929.01, which was reduced by one-half under article 29, leaving $844,814.50. In this set of circumstances, we can find no material mistake which should lead to reformation of the contract. Plaintiff is entitled to recover neither for misrepresentation nor on the basis of mistake.

■ The defendant has interposed a counterclaim only remotely connected with the plaintiff's claim but very closely related to our recent ruling in Ozark Dam Constructors v. United States, Ct. Cl., decided April 7, 1961, 288 F.2d 913. In the course of construction of the Bull Shoals Dam by the present joint venturers (using the name Ozark Dam Contractors), a railroad strike for a time prevented the defendant from supplying the cement which it had agreed to furnish for the project, thus interrupting the contractor's work and increasing its costs. Ozark Dam Contractors sued for damages, and after a trial the court denied recovery, holding that (a) the defendant's representatives were not negligent in dealing with the problems raised for the contractor by the strike, and (b) the contractor was not entitled to an "equitable adjustment" of the price, under a contractual provision relating to suspension of work for the convenience of the Government, because the work was suspended, not for the Government's convenience, but because of a railroad strike which the defendant did not cause or desire.

The present contract was tied to the Dam project since the rock aggregate was to be delivered to Bull Shoals for mixing with cement to make concrete; the interruption in Bull Shoals work was reflected in a delay in plaintiff's work. The joint venturers' contract now before

sumed by the Government. Representations made but not so expressly assumed by the Government in the contract shall be deemed only for the information of the contractor and the Government will not be liable or responsible therefor."

12. The specifications stated that "[t]here is available within the designated area and within the approved limits, shown on the drawings, an adequate supply of material from which fine and coarse aggregate meeting the requirements of Part IV of these specifications can be manufactured." This provision was not a representation that sufficient rock could be extracted in a sidehill operation; the areas referred to were the whole quarry area on Lee Mountain. See findings 25, 38, 41.

us, under the name of Flippin Materials Company, contained a similar clause for suspension of work for the convenience of the Government, as well as for an "equitable adjustment" in case of an unreasonably disrupting suspension of that kind. After the strike stopped deliveries of cement to the Dam project, this plaintiff requested such a suspension order and an equitable adjustment. The contracting officer denied the request, but on appeal the Corps of Engineers Claims and Appeals Board held that an appropriate price adjustment should be made. Under this ruling, the contracting officer issued a change order modifying the contract price to add $83,478.17 "as complete compensation for the delay resulting from the strike of the Missouri Pacific Railroad." Deducting half of this sum under article 29 of the contract (mentioned above), the defendant paid plaintiff $41,739.08. It now counterclaims to recover that sum on the ground that the Claims and Appeals Board erred as a matter of law in holding that the work-interruption was for the convenience of the Government.

■ This precise point was upheld by the majority of the court in the Ozark Dam Constructors opinion. Applying a suspension provision identical with that set forth in the present contract, the court ruled flatly that the clause was inapplicable and that the work had not been suspended for the convenience of the Government. See 288 F.2d at 918–919. Although all members of the court did not agree with that conclusion, we feel that it should be followed in a case so nearly identical in parties, facts, and contract provisions. In all probability, the present joint venturers, being the same individuals and entities involved in the earlier case (though acting under a different name), are collaterally estopped by the prior judgment. Cf. Sucesores de L. Villamil & Co., S. en C. v. Merced, 239 F. 86 (C.A.1, 1916); United States v. Moser, 266 U.S. 236, 242, 45 S.Ct. 66, 69 L.Ed. 262 (1924); Hansberry v. Lee, 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed.

22 (1940); Associated Oil Co. v. Edgerton, 158 Or. 607, 77 P.2d 416–417 (Ore., 1938). In any event, the prior decision is a recent precedent, on a very special set of circumstances, which is as close as can be to the present case. We decline to reconsider the issue anew; we adhere, rather, to the 1961 ruling of this court as settling the point. Cf. Lincoln National Life Ins. Co. v. Roosth, 306 F.2d 110, 112–114 (C.A.5, 1962).

■ It makes no difference that in this instance the Claims and Appeals Board held for the contractor, while it rejected the claim in the companion case. The court's express ruling in Ozark Dam Constructors was that, as a matter of law, the contractual provision upon which the board relied could not be read so as to sustain an "equitable adjustment." A holding of a contract appeals board which is erroneous in law has no binding effect. The contract modification resulting from the board's decision can have no higher status; unsupported by the framework of the contract or by any new consideration, the modification was void as an unauthorized gratuity without consideration. See, e. g., Burke & James, Inc. v. United States, 63 Ct.Cl. 36, 56–57 (1927). Under familiar principles, the Government is entitled to recover a payment made through an error of law. E. g., Wisconsin Central Rd. Co. v. United States, 164 U.S. 190, 210, 17 S.Ct. 45, 41 L.Ed. 399 (1896); Milwaukee Shipbuilding & Engineering Co. v. United States, 121 F.Supp. 922, 129 Ct.Cl. 167, 175–176 (1954).

For these reasons, plaintiff is not entitled to recover on its claim but the defendant is entitled to recover on the counterclaim. The petition is dismissed and judgment will be entered for the defendant for $41,739.08 (the sum received by the plaintiff under the contract modification involved in the counterclaim).

JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.