ARCHIE AND ALLAN SPIERS, INC.

v.

UNITED STATES.

No. 219-58.

United States Court of Claims.
Dec. 6, 1961.

Gaines V. Palmes, Washington, D. C., for plaintiff.

David V. Anthony, Washington, D. C., with whom was Asst. Atty. Gen. William H. Orrick, Jr., for defendant. John F. Wolf, Washington, D. C., was on the brief.

LARAMORE, Judge.

This action involves three separate claims by plaintiff resulting from a contract with the Navy to rehabilitate certain piers at the U. S. Naval Base (Naval Supply Center), Norfolk, Virginia.

Claim No. 1 is for damages for delays which occurred during an alleged 4-months' period subsequent to completion of the contract work, which resulted from defendant's alleged failure to accept the work promptly after it was completed.

Claim No. 2 is for damages caused by what plaintiff contends was an erroneous contract drawing on which plaintiff relied in bidding.

Claim No. 3 is for increased costs sustained in maintaining certain pipelines after they were completed by plaintiff and possession thereof taken by defendant.

Plaintiff's claims were rejected by the contracting officer, and the Armed Services Board of Contract Appeals dismissed them for lack of jurisdiction. Suit in this court resulted and trial was had before a commissioner of this court. The commissioner has filed his report and numerous exceptions are taken by plaintiff to the commissioner's findings.

Since the exceptions are many, we will not here undertake to discuss each one. Suffice to say that from an examination of the record we conclude that the commissioner's findings are, with one exception, correct. The exception above noted has reference to commissioner's finding 5. This finding lists the original contract price and the price as amended by change orders. The finding then recites payment for the contract work as amended and lists the contractor's costs in the performance of the contract as amended. Finally, finding 5 sets forth the profit as being $43,073.03, or 8.99 percent of costs, and states that the contractor " * * * thus realized a profit in excess of the 8% anticipated by it."

We deem the profit made by plaintiff to be irrelevant to the issue of whether or not plaintiff sustained damages; consequently, plaintiff's exception to finding 5 is sustained, and said finding is not adopted by the court.

The facts relating to plaintiff's claims are as follows: On June 30, 1951, pursuant to an invitation for bids, plaintiff and defendant entered into a contract calling for the rehabilitation of designated pipelines on piers at the U. S. Naval Base (Naval Supply Center), Norfolk, Virginia. The contract price as increased by change orders was $522,-148.90. The plaintiff's bid was the only bid received by defendant under its invitation.

The plaintiff, a Virginia corporation, has its principal place of business in Newport News, Virginia, and for many years has been engaged as a plumbing and mechanical contractor.

The contract required that work be commenced on June 30, 1951, and be completed by March 26, 1952. The contract contained a liquidated damages provision. By change orders issued pursuant to the termination of the contract, the contract completion date was extended by 538 cal-

endar days, increasing the time for performance from the originally specified time of 270 days to 808 days, and the revised completion date was September 15, 1953. The work was completed in September of 1953 and no liquidated damages were charged. The contract work was accepted on January 12, 1954, retroactively to September 8, 1953.

The work required under the contract consisted of the removal and renewal of fuel oil and diesel oil piping on five piers, each approximately 1,350 feet long. Also required under the contract was the renewal of fresh water piping on two piers, and removal of gasoline piping on all piers. The contract also called for some earth work, concrete, steel and iron work, as well as insulation and weatherproofing on the pipelines. The piping was to be removed from and installed on the underside of the piers where it was suspended by hangers and supports.

Plaintiff was requested by telephone to bid on the project in suit. It appears that one of the considerations with which the Navy contracting officer was faced at the time was the impending close of the fiscal year. In any event, on Friday, June 22, 1951, Mr. Allan Spiers went to the naval base and obtained the bid data. On June 28, 1951, plaintiff submitted its bid and was awarded the contract on June 30, 1951.

No examination of the site of the work was made on behalf of plaintiff before submission of its bid, although under the provisions of paragraph 1–21 and article 4(b) of the contract it was informed that inspection of the site was expected.

Paragraph 1–21 of the contract specifications provides:

"1–21. *Examination of Premises.* —Before submitting proposals, bidders are expected to inspect carefully the work in place and satisfy themselves as to the character and amount of work to be removed, renewed or replaced, and of new work. In this connection particular attention is invited to paragraph 1 of form no. 767d."

Article 4(b) of the contract provides:

"Article 4.—Performance of the Work

"(b) *Changed Conditions.*—Information respecting the site of the work given in drawings or specifications has been obtained by Government representatives and is believed to be reasonably correct but the Government does not warrant either the completeness or accuracy of such information and it is the responsibility of the Contractor to verify all such information; *Provided,* That in case of subsurface, latent, or unknown conditions, this contract may be modified, when, in the manner, and to the extent hereinafter in this subparagraph provided: Should the Contractor encounter, or the Government discover, during the progress of the work, subsurface or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as being inherent in work of the character provided for in the drawings and specifications, the Contracting Officer shall be notified before the existing conditions are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ, the contract shall be modified by the Contracting Officer to provide for any increase or decrease in cost and difference in time resulting from such conditions and an equitable adjustment in the pertinent contract terms shall be made in accordance with the provisions of paragraph (a) of Article 10 hereof. Such modification by the Contracting Officer shall be final, subject only to appeal under the provisions of Article 16."

Much of the work was contracted for and performed by plaintiff during the Korean conflict, and plaintiff knew at the

time of bidding that there was a steel shortage. Plaintiff qualified its bid in this regard, as follows:

"* * * NOTE.—Manufacturers state, materials will not be shipped, before sometime in the fourth quarter of this year, even with a D.O. rating. Contract Limits will have to be discussed later. * * *"

Plaintiff's letter of June 29, 1951, discussed the time extension that would be required to obtain materials. All materials required for performance were furnished by the contractor. There was no provision for Government-furnished material.

While plaintiff appears to have ordered the necessary material shortly after award of the contract, very little was done to perform the work until October of 1951.

By the end of January 1952, approximately 530 pipe hangers had been fabricated in accordance with the dimensions shown on the contract drawings for a typical hanger. When the first hanger was fabricated it was checked at one place where a hanger was to be located, and it appeared to be satisfactory for that location. On the assumption by the plaintiff's workmen that the measurements for the typical hanger were correct for every location where a hanger was to be placed, and without further verification of conditions at other hanger locations, the 530 hangers were made to the same dimensions.

On January 21, 1952, plaintiff began drilling at hanger locations preparatory to erection of the hangers. This continued until January 27, when it became apparent that the 530 pipe hangers fabricated could not be used due to interferences caused by pilings supporting the concrete deck of the pier, and also due to uneven grade on the underside of the concrete deck of the pier.

The contract drawings had been prepared by a private firm of architects and engineers and consisted of eight sheets, one of which showed the general piping layout for all five piers. The general piping layout contained "general notes" as follows:

"For detail description of work see individual pier drawings.

"Contractor shall verify all dimensions and conditions at the site."

There were also five separate drawings, one for each pier. These drawings also contained under "general notes" the following statement:

"Contractor shall verify all dimensions and conditions at the site."

Four days after plaintiff learned that some pilings on pier 2 were not in the exact location indicated on the plans, the architect-engineer, the plaintiff, and the Government's representatives, met to discuss the matter. By February 5, 1952, the architect-engineer had conducted a field survey and had determined the trouble. The architect-engineer immediately proceeded to revise the plans, which were submitted to plaintiff for estimate on March 4, 1952. These estimates were submitted by plaintiff on March 10, 1952, and formal authorization to proceed was issued on April 10, 1952. However, prior to receipt of formal authorization to proceed, plaintiff fabricated new hangers under the revised drawings received March 4 and also installed new pipe on pier 2. During February and March of 1952, plaintiff continued the work on pier 2 and other piers, such as the excavation of valve pit covers, hauling of dirt from such excavation, fabrication of valve pit covers, installation of fittings, fabrication and installation of pipe racks, the installation of watermains in pier 2, and pouring concrete in the construction of the valve pits. However, no work was done on some of the days because of inclement weather.

Due to the priority system then in effect as a result of the Korean conflict, plaintiff did not receive the 6" and 12" steel pipe necessary to do the work under the contract until March 10, 1952, just 20 days prior to the original contract completion date.

Without awaiting authority to proceed, plaintiff on March 10, 1952, began to re-

move old pipe on pier 2 and replace it with new pipe. Beginning on March 19, 1952, new pipe was installed on almost a daily basis until April 10, 1952, when formal authority to proceed was issued.

During July of 1952, while work was in progress on piers 2 and 3, and lead work was beginning on pier 4, it was determined that all 6″ and 12″ pipe on pier 4 should be replaced. Change Order F was issued to cover the new work on January 20, 1953. This new work was fully paid for under the change order.

Pursuant to article 10, the contracting officer by Change Orders A, C and F, ordered additional work and an increase in contract price. Each change order was submitted to and accepted by the plaintiff. The work was duly performed by the plaintiff, and the plaintiff was compensated therefor. There is no satisfactory proof that the orderly progress of the work was affected by the additional work order.

It was anticipated and understood by the parties that the plaintiff should proceed in its work in such a manner as to cause the least possible disturbance to the naval activities of the Naval Supply Center. Navy ships were serviced at the five piers during the entire period of performance of the contract work. The fuel and diesel oil connections were cut off on only one side of one pier at any one time, thus allowing servicing of ships on both sides of four piers and on one side of the fifth pier while the work was in progress.

Naval activities at the piers were no greater than was anticipated by the parties. However, due allowance for such naval activities was not made by plaintiff in the preparation of its bid.

During the performance of the contract work, the plaintiff applied waterproofing to the pipes that had been installed as a part of the contract work. When defects in the waterproofing appeared, they were called to the attention of plaintiff by the Navy inspector and such defects were corrected. The defects were due to damage caused by floating debris, as well as installation on pipe which was not completely dry. Such corrections took place during the entire performance period of the contract. The record does not disclose what portion of the waterproofing work under piers 2, 3, and 5 was initial work and what portion was replacement work, if any. There is also no evidence of what portion, if any, was required because of scarring by floating debris. However, the contract clearly contemplated maintenance and repair work by the plaintiff.

On September 14, 1953, the plaintiff wrote the following letter to the officer in charge of construction:

"Re Contract NOy–27124, Rehabilitation of Pipe Lines, Naval Supply Center.

"Gentlemen: This is to advise you that we have finished the above reference job according to our contract and we are ready to move out our men and equipment, but due to failure of the twelve inch (12″) expansion joints to work properly because of inadequate anchorage as installed according to plans, we are now faced with an additional change order to correct this fault.

"The Architects are now preparing additional drawings, correcting expansion joint anchorage. While we are not particularly interested in this change order we understand that the Navy will not accept the job until this condition is corrected, and we are therefore willing to cooperate with the Navy to correct the expansion joint anchorage and to advise you so that it will be on record that we will expect the Navy to reimburse us for holding men and equipment on the job until such time as we are in receipt of the change order.

"We wish, also, to advise you that we will not be responsible for damage done to expansion joints and piping because of the inadequate anchorage.

"As you know the entire job is subject to the elements and this

change order will prolong the acceptance by the Navy, causing us to feel that we should be relieved of any responsibility of damage from any act of God or man beyond our control.

"Thanking you for your attention to the above, we are

"Very truly yours,

"Archie and Allan Spiers, Inc.,

Archie Spiers, *Vice President.*"

The officer in charge of construction replied to the above letter on September 28, 1953, as follows:

" * * * With reference to your letter of 14 September 1953 regarding the failure of the twelve inch (12″) expansion joints, an inspection of the installation by representatives from this office revealed the fact that the expansion joint anchors were not installed in accordance with the contract drawings.

"It would be inconvenient to the Navy to cut the oil supply off on the piers at this time to reinstall the joint anchors as shown on the drawings. To prevent this the Officer in Charge of Construction is investigating the possibility of providing some method of anchoring these joints properly which will be of the best advantage to the Government and the contractor. * * *"

By November 12, 1953, the architect-engineer had made a recommendation to the Navy for the anchoring of expansion joints, and on that date a copy of the drawings of such proposed method was handed to the plaintiff's superintendent. It was requested that an estimate for performance of the work covered by the drawings be submitted.

On November 17 and 20, 1953, plaintiff submitted its estimate for doing the work, and on January 8, 1954, it furnished a written breakdown of the November 20 estimate. After consideration of the price proposal, the Government on January 12, 1954, four days after receipt of plaintiff's last proposal dated January 8, 1954, accepted the work as performed by the plaintiff and decided not to issue a change order involving repair or additional work by the plaintiff. Said acceptance was retroactive to September 8, 1953.

The period between September 1953 and early January 1954 was spent in a careful investigation and consideration of a possible remedy for the defective work.

During the period from about the middle of September 1953, to January 12, 1954, the plaintiff's superintendent remained at the job. His salary was $120 per week. One employee, a waterproofer, was also at the job from September 30, 1953, to January 12, 1954. He was an hourly employee whose rate was $1.85 per hour. This employee was engaged in repairs to the coal tar covering (waterproofing) on the fuel and diesel oil pipes which had been damaged due to action of the elements.

For some reason, the plaintiff has in its brief discussed the issues in order of Claim No. 2, Claim No. 3, and Claim No. 1. Therefore, this order issued in our decision.

Claim No. 2, as stated earlier, is for damages caused by an erroneous contract drawing on which plaintiff relied in bidding.

■ In respect to Claim No. 2, it is contended by plaintiff that because of the erroneous drawings supplied, drastic changes had to be made. Plaintiff says that it could, but for the changes, have completed the job in seven months after the work of installing the pipe hangers was commenced in January of 1952. However, it is contended that due to the erroneous contract drawings, coupled with long delays by defendant in taking corrective measures, the performance of the original contract work took about 15 months. Consequently, plaintiff claims increased direct labor costs arising out of the disruption of operations, and increased overhead and equipment costs due to the prolonged period of performance.

The contract called for the rehabilitation of old existing piers. The evidence

discloses and common sense dictates that after years of use, due to settling and/or constant bumping by ships, the measurements contained in the contract drawings could not be deemed accurate in all respects. This is especially true in a situation where the contract drawings present but one measurement. It was for this reason that the contract was drawn so as to warn bidders not to place reliance on the specifications, but that bidders should "inspect carefully the work in place and satisfy themselves as to the character and amount of work to be removed, renewed or replaced, and of new work." (Paragraph 1–21.) Furthermore, on the general drawing there appeared a warning "contractor shall verify all dimensions and conditions at the site." In addition, on each separate drawing for each pier there was a further warning: "contractors shall verify all dimensions and conditions at the site."

These warning clauses were not idly placed in the contract. They were meaningful and necessary in the light of the nature of the contract and the condition of the old piers. Therefore, if the contractor miscalculated or failed to examine the site and verify the measurements, which were called to his attention by the contract itself, no claim could arise even though the contractor sustained a loss. Blauner Construction Co. v. United States, 94 Ct.Cl. 503.

Plaintiff contends that paragraph 1–21 of the specifications and the warning clauses on the contract drawings were meaningless and of no legal effect. Plaintiff characterizes the warning clauses as "exculpatory clauses" and asks this court to disregard them. To support this proposition, plaintiff cites such cases as United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166; Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898; Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933; and United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735. However, none of the cited cases deals with a clause such as paragraph 1–21 or the warning clauses contained in the contract drawings. What the cases generally hold is that where the Government has made a positive representation of a fact of which it should have knowledge, and where in the circumstances the contractor could reasonably rely on the Government's representation without an investigation of its own, the Government will not be relieved of responsibility merely because of the presence of a clause in the specifications admonishing the contractor to inspect the premises. Such is not the case here, and the cited cases do not remove such cautioning clauses from contracts. Blauner Construction Co. v. United States, supra; C. W. Blakeslee & Sons, Inc. v. United States, 89 Ct.Cl. 226; MacArthur Bros. Co. v. United States, 258 U.S. 6, 42 S.Ct. 225, 66 L.Ed. 433; Anthony M. Meyerstein, Inc. v. United States, 137 F.Supp. 427, 133 Ct.Cl. 694; Puget Sound Bridge & Dredging Co. v. United States, 130 F.Supp. 368, 131 Ct. Cl. 490; Triest & Earle v. United States, 84 Ct.Cl. 84, cert. denied 302 U.S. 696, 58 S.Ct. 14, 82 L.Ed. 538; General Contracting Corp. v. United States, 88 Ct.Cl. 214.

In other words, as the court stated in Midland Land & Improvement Co. v. United States, 58 Ct.Cl. 671, 683, aff'd 270 U.S. 251, 46 S.Ct. 218, 70 L.Ed. 570:

> "The burden of proving misrepresentation rests upon the party making the allegation. It is not to be presumed, and one may not, either under the Christie or Hollerbach Case, simply show a different condition in *some* respects from that which the chart or blue prints of borings disclose, * * *. There must be some degree of culpability attached to the makers of the maps and charts, either that they were knowingly untrue or were prepared as the result of such a serious and egregious error that the court may imply bad faith. The many contract cases in this court, too many to cite, sustain this principle."

There is no question that had the contract misrepresented the conditions existing under the piers, the Government would be liable in damages. Again, how-

ever, the record discloses that such was not the case. To the contrary, the evidence discloses that there was no misrepresentation (finding 20).

Thus it is concluded that the contract represented what the Government believed to be the true conditions at the site; the contractor was not mislead and, therefore, was not justified in ignoring the warnings therein contained.

Further, the contractor had ample time to check the dimensions, and it is apparent that it did not do so. Delivery of pipe was delayed almost nine months due to the Korean conflict, and plaintiff had the nine months in which to verify dimensions. Even if plaintiff had not ample time to verify dimensions, it was under no compulsion to bid.

In addition, the evidence shows that the plaintiff was in no way delayed through the issuance of Change Order A. Plaintiff asserts that it was delayed for the period from January 27, 1952, when it first discovered that all dimensions and conditions on all piers were not the same, until April 10, 1952, when the proceed order for Change Order A was issued. The commissioner, however, has found, which finding we adopt, that revised drawings were issued to plaintiff on March 4, 1952, and that plaintiff immediately proceeded under them without waiting for the order of April 10, 1952. The commissioner further found, and we also adopt these findings, that the 6″ and 12″ pipe for the job did not arrive until March 10, 1952, and that immediately upon its receipt plaintiff began to install it, not waiting for the proceed order, and during all of this period various other supporting work was also performed.

Accordingly, we conclude, as did the commissioner, that since delays, if any, occurring prior to March 10, 1952, were concurrent with delays caused by nonreceipt of pipe for which the Government is not responsible, and since plaintiff, upon receipt of the pipe, immediately began to install it in accordance with the revised drawings previously furnished, the plaintiff was in fact not delayed even though the formal authorization to proceed was not issued until April 10, 1952.

Nor was the orderly progress of the work affected by other change orders; i. e., C and F. The evidence discloses, and the commissioner has found as a fact, that the work under Change Orders A, C, and F was performed by plaintiff, and the plaintiff was duly compensated therefor. The facts show that "there is no satisfactory proof that the orderly progress of the work was affected by the additional work orders."

Plaintiff's Claim No. 3 is a claim for reimbursement of costs alleged to have been expended by it in maintaining pipelines after completion of the work, but prior to acceptance by the Government.

In respect to Claim No. 3, plaintiff contends that article 19(b) of the contract provided that if the Government took possession of any part of the work with the intention of retaining possession thereof, the contractor shall be relieved of responsibility for loss or damage to the part taken over by the Government other than that resulting from the contractor's fault or negligence. Plaintiff then says that the Government took over possession of each pipeline on a pier as it was completed and immediately began to refuel ships from the recently constructed facilities. Plaintiff further states that once the Government took over possession of a pier, that possession was never returned to the contractor; that plaintiff asked defendant's representatives to assume the maintenance and repair work on each pier when it was taken over, but that defendant refused stating that there could be no partial acceptance of the work; that plaintiff was required to continue with maintenance and repair work on each pier until January 12, 1954, despite the fact that the Government had taken over possession of the piers *seriatim*.

There may be other and compelling reasons why plaintiff cannot recover on

this claim; however, this claim must fall for failure of proof. This failure of proof is fully disclosed by finding 28, which is adopted by the court, as follows:

"28. During the period April 1, 1953 through September 8, 1953, plaintiff installed new pipe under Piers 4 and 7, and performed initial waterproofing work under these piers. During the months of July and August 1953 some waterproofing was applied to pipes under Piers 2, 3, and 5. The record does not disclose what portion of the waterproofing work under Piers 2, 3, and 5 was initial work and what portion was replacement work, if any. Further, if some of this work was replacement, the record does not disclose what portion was necessitated through the improper initial application of the waterproofing on damp surfaces by plaintiff. There is no evidence of what portion, if any, was required because of scarring by floating debris."

Clearly, article 4(d) of the contract required that the contractor shall be responsible for all work performed until completion and final acceptance. Clearly, article 19(b) of the contract relieved the contractor of damage other than that resulting from its own negligence after acceptance by the Government.

Thus, even were we to assume that the Government actually took possession of certain work when completed, it would be necessary for plaintiff to prove what portion of the costs under this claim were for initial work and what portion was for replacement work occasioned because of scarring by floating debris. Without this proof there can be no basis for judgment against the Government.

Plaintiff's Claim No. 1 is for costs allegedly incurred by it after September 8, 1953, which costs allegedly resulted from defendant's failure to accept the work promptly after it was completed.

It is defendant's position that the Navy refused to accept the work in September of 1953 for the reason that plaintiff had failed to properly install the expansion joint anchors, and that the time period involved was consumed by investigation to find a remedy to correct this deficiency without shutting down the fuel lines with consequent disruption of the Navy's fueling operations.

Plaintiff contends that the defect in installation of expansion joint anchors was solely due to faulty plans supplied by the defendant, and since the plaintiff had already finished the work called for by those plans in September of 1953, it had no obligation to correct the installation.

On September 14, 1953, the plaintiff wrote a letter to the officer in charge of construction in which it claimed the work had been finished according to the contract, and that the expansion joint anchors were installed according to the plans. Plaintiff also advised that it was willing to undertake the corrective work, but that it would not be responsible for damages done because of the inadequate anchorage.

The officer in charge of construction replied, stating that an inspection revealed the fact that the expansion joint anchors were not installed in accordance with the contract drawings. The officer in charge went on to explain that, in order to prevent the cutting off of oil supplies to the Navy, an investigation was being made to determine the possibility of some method of anchoring the joints properly which would be of the best advantage to the Government and the contractor.

There the matter ends, so far as the evidence and the facts disclose, and the question of whether the plaintiff was without fault is left to conjecture.

Certainly it is the burden of the plaintiff to prove that the delay in completion of the work was due to the fault of the Government. Failing in this respect, we cannot now determine whether a claim for damages flowing from the 4-day or 4-month delay is actionable.

Plaintiff, in an effort to avoid the implication of the above, argues that de-

fendant recognized that the expansion joint anchors were properly installed when it requested a new estimate or bid for extra work to correct the defect, secondly by rejecting the bid on its merits rather than on the theory that plaintiff was further obligated under the original contract, and thirdly by accepting the work already done retroactively to September.

We can see no merit in this contention. It is clearly shown by the evidence that the Navy was seeking some new method of correction to avoid inconvenience to the Navy. Having found a method the Navy undoubtedly thought the price was too high. Hence it decided not to do the work and accepted retroactively. We think this is an adequate explanation of the Navy's conduct, and in no sense do we deem it an admission by the Government that the plaintiff correctly installed the expansion joint anchors in compliance with the contract.

Nor can it be said that the Navy finally accepted the work on the piers when plaintiff finished. To the contrary, the naval officials made it clear that the work was not acceptable.

It is apparent from what is stated earlier that both the Navy and the contractor used the facilities at the same time with an effort to interfere with each other as little as possible. It was a matter of convenience to the Navy as well as to the contractor. This procedure was clearly contemplated by the contract, and the action of the Navy in no sense can be construed to be a taking of possession.

Under the circumstances of a positive taking of possession, the right to exclude all others is a necessary substance. Rice et al. v. Frayser et al., C.C., 24 F. 460. Certainly the Navy at no time had the right to exclude the contractor until the work was fully and finally completed according to the contract.

Having failed in its burden of proof as stated above, plaintiff cannot recover on Claim No. 1.

Plaintiff in its reply brief strongly urges that in the original answer defendant made admissions of material allegations of fact which amounted to confessing liability.

The facts relative to this contention are these: Plaintiff amended its complaint, changing the theory of the case. Defendant then asked and was granted leave to file an amended answer. The amended answer contained denials of the allegations in the petition which were previously admitted.

The Government now says the original answer was in error. However, even if not in error initially, when the plaintiff amended, changing its theory, it was well within defendant's rights to file a new or amended answer changing its defense. The office of the petition and answer is to permit introduction of the true facts in the record. If something was inadvertently or erroneously admitted, it is not only the right but the duty of the defendant to correct the error. We can find nothing erroneous in the court's order permitting defendant to amend its answer. Furthermore, plaintiff was not harmed in that it was given the opportunity to reopen the hearing and call any witnesses it had in rebuttal. Plaintiff failed to do so, saying it had already expended large sums of money in the trial of the case. We do not think this is a reasonable excuse for failing to introduce further evidence if such were available. Nor is it a reason why defendant should be faced with admissions either inadvertently or erroneously made.

For the reasons above stated, plaintiff's petition will be dismissed.

It is so ordered.

DARR, Senior District Judge, sitting by designation, JONES, Chief Judge, and DURFEE and WHITAKER, Judges, concur.