**ALLIED CONTRACTORS, INC.**

v.

**The UNITED STATES.**

No. 256–61.

United States Court of Claims.

July 20, 1967.

Andrew B. Kingan, Baltimore, Md., for plaintiff.

Mary J. Turner, Washington, D. C., with whom was Acting Asst. Atty. Gen. Carl Eardley, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and

recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on April 19, 1967. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On June 8, 1967, defendant filed a motion that the court adopt the commissioner's opinion. Since the court agrees with the commissioner's findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.

### OPINION OF COMMISSIONER *

GAMER, Commissioner:

Plaintiff entered into a contract with the Army Corps of Engineers for the construction of a "Nike Launching Area" at a site near Davidsonville in Anne Arundel County, Maryland. During construction, two walls collapsed. Plaintiff contends that these walls were constructed by it in strict compliance with the plans and specifications and that their collapse was due only to their erroneous design, for which defendant was responsible. This issuance by defendant of defective plans and specifications, plaintiff argues, amounts to a breach of contract entitling it to recover the additional costs it incurred resulting from the collapse of the walls and their reconstruction, as required by defendant.

On the basis of the record of the trial proceedings herein,[1] it is concluded that plaintiff is not entitled to recover because, even if it is correct in its contention that the walls were erroneously designed, it was obvious, and plaintiff therefore knew or should have known that, considering their nature and character, they would, unless properly supported, collapse under certain conditions, which here materialized. Accordingly, it was plaintiff's clear obligation to take appropriate protective or precautionary

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

[1]. Plaintiff had sought a change order for the extra work that the collapse of the walls caused it, but its claim was denied by the contracting officer, the Chief of Engineers, and the Armed Services Board of Contract Appeals (ASBCA No. 5254). After United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L. Ed.2d 652, decided June 3, 1963, defendant objected to holding a trial in this case, relying on the finality of the Board decision denying the change order. However, by order of May 13, 1964, the commissioner ruled that, since one of the bases of the claim was that defendant had issued defective plans and specifications, which would amount to a breach of contract, the Bianchi doctrine would not serve to deprive plaintiff of a trial in this court, and by order of December 14, 1964, defendant's request for a review of the commissioner's ruling was denied by the court, but without prejudice and the case remanded to the commissioner for further proceedings in the light of the court's opinion in Utah Constr. & Mining Co. v. United States, 339 F.2d 606, 168 Ct.Cl. 522, decided December 11, 1964. Since the court's *Utah Constr.* decision affirmed the practice of holding trials *de novo* in suits founded upon breach of contract despite the agency's findings on the issues involved in the dispute, it was concluded that the court's *Utah* decision would not affect the commissioner's original ruling permitting plaintiff to proceed with a trial in this court, and such trial proceedings were held on March 15, 1966.

Although the Supreme Court's subsequent partial reversal of *Utah* (384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642) on June 6, 1966, as well as its decision on the same day in United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S. Ct. 1539, 16 L.Ed.2d 662, served to cast doubt upon the propriety of conducting trial proceedings in this court in a case such as the instant one where plaintiff had sought change order relief before the agency on the very "breach of contract" claim for which its petition was filed herein, defendant, in view of the fact that a trial has already been held, now "waives whatever rights it may be deemed to have under the recent Supreme Court decisions in *Utah* and *Grace* in the interests of justice and expedition of the case" (Defendant's Requested Findings and Brief for the Commissioner, p. 1, n. 1).

measures to prevent this from happening.

These walls were unusual. They were so-called block masonry walls located on only two sides of a rectangular underground pit. This pit was below, and of smaller dimensions than, another pit. The walls were to be constructed according to a specified planned sequence. First, even prior to the excavation of the pit, wood sheet piling or shoring was to be driven into the earth at the boundary of the pit. After the pit would be excavated up to the sheeting, the block wall (concrete blocks held together with mortar) was then to be built flush against the sheeting. However, the wall extended about 9 inches above the sheeting, the top of the wall thus being in direct contact with earth during such period of construction. The wall was 6 feet, 6 inches, in height, 60 feet long, and only 4 inches thick. A 2-inch subfoundation concrete base was then to be poured. A heavy waterproofing membrane (5 plies) was then to be applied on such base and all the way up the inside height of the walls. A 2-foot foundation concrete floor slab was then to be poured on the waterproofed 2-inch subfoundation base, and a 2-foot concrete wall also poured against the waterproofed 4-inch block wall. There was to be nothing between the smooth surfaces of the waterproofed block wall and the 2-foot concrete wall. When completed, the 4-inch block wall and the 2-foot concrete wall together were to form a one-wall-like (i. e., a "monolithic") structure, with the waterproofing material incorporated within the structure.

Only two of these block walls, located on the opposite sides of the pit, were to be constructed. Thus, during the above-described construction sequence and until the 2-foot wall would be poured against it (and the 2-foot floor slab, which would supply partial support), the walls would stand unsupported by connecting side walls, as in the conventional 4-walled structure, or by any structure on top, or by anything on the waterproofing membrane side facing the pit. Except for the sheeting and earth on the back side, these long thin walls would thus simply stand without any support.

In the pit in question, plaintiff had by August 4, 1954, completed driving the sheet piling, excavating the pit, laying the 4-inch block walls, pouring the 2-inch concrete base, and applying the waterproofing. Heavy rainfall occurred in the area on August 2, 3, 5, 9, and 10. On the night of August 10, while the south wall was standing in the above-described unsupported position, i. e., prior to the pouring of the 2-foot concrete wall and the 2-foot floor slab, the wall collapsed, falling into the open pit and onto the subfoundation base.

Heavy rain occurred again on the night of August 19. During that night, the wall on the north side of the pit, similarly standing in the same unsupported condition, also collapsed into the pit.

Both walls had collapsed due to the hydrostatic or water pressure exerted behind them and which had been built up as a result of the rains. The pressure simply served to push the walls into the pit, there being no counteracting force of any kind. Although the walls were built against the sheeting, the sheeting was not watertight, nor was it designed to be. It consisted of wood boards driven alongside of each other, with $\frac{1}{8}$ to $\frac{1}{4}$-inch spaces between the boards, permitting water and silt to penetrate. In addition, since the sheeting did not extend to the top of the wall, the rear of the wall was directly exposed to wet earth.[2]

2. Furthermore, as to the south wall, the situation may have been aggravated somewhat by the filling with sand on August 10, the very day the wall collapsed, of some small voids between the sheeting and the wall. Defendant argues that under the plans, the wall was supposed to have been flush against the sheeting, that the existence of the voids were therefore attributable to improper construction practices on plaintiff's part, and that the corrective sandfilling technique adopted by plaintiff was also improper in that it served to apply even

■ Plaintiff says it built the walls exactly as called for by the plans and specifications, and that if they were not strong enough to withstand hydrostatic pressure, then it was simply a matter of improper design for which defendant alone was responsible. It contends that a contract drawing contained a "Structural Note" which, properly interpreted, stated that the walls were designed to withstand hydrostatic pressure,[3] a statement upon which it had a right to rely. It points out that the pertinent "Protection" section of the specifications (TP sec. 6–08j (finding 9)) made no provision for the temporary buttressing or supporting of the walls against hydrostatic pressure due to rain or snow during the course of construction, and that plaintiff fully complied with all of the affirmative requirements which were specified by such section. Thus, attributing its damages solely to defendant's improperly designed walls, it seeks recovery upon the principles enumerated in such cases as United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L. Ed. 166 (1918), Steel Products Engineering Co. v. United States, 71 Ct.Cl. 457 (1931), Stapleton Constr. Co. v. United States, 92 Ct.Cl. 551 (1940), and Warren Bros. Roads Co. v. United States, 105 F. Supp. 826, 123 Ct.Cl. 48 (1952), to the effect that the Government is liable for damages resulting from the issuance of faulty or inadequate plans, specifications,

or designs, or for misleading the contractor by erroneous statements contained therein.

Defendant, however, denies that the plans and specifications were in any way defective. It says that the "Structural Note" reference to hydrostatic pressure plainly referred only to the completed structure, and not to uncompleted components during the interim construction period, that plans and specifications do not customarily specify how a contractor should protect his partially completed work during such construction period, and that this is not only the generally recognized responsibility of the contractor, but that the contract here involved specifically provided (Specification GP–11 (finding 9)) that the contractor should be responsible for all work performed until completion and final acceptance, and that it should have been obvious to the contractor that, until the 2-foot concrete walls were constructed against them, the 4-inch block walls would have to have some kind of support against the possibility, in the event of rain of hydrostatic pressure from the rear.

■ It is not necessary to determine the dispute between the parties as to whether the design of the walls was in fact improper or as to the technically correct interpretation of the Structural Note concerning hydrostatic pressure.[4] For even assuming, *arguendo*, the correctness of plaintiff's contentions in

more pressure against the wall from the rear, thus contributing to the collapse. Defendant says that its resident engineer pointed out to plaintiff that the existence of the voids was due to plaintiff's improper construction and that plaintiff's corrective action was taken in response to the engineer's complaint.

However, the aggravating effect of this additional factor is somewhat problematical since the subsequent collapse of the north wall occurred without, insofar as the record indicates, any such immediately contributing factor. The engineer's fear was that, unless the voids were filled, there might be wall movement backward when the 2-foot concrete wall was poured against it, with consequent damage to the waterproof membrane. It does not appear that he was thinking,

in this connection, of a forward fall into the pit, such as actually occurred.

3. The Note, headed "Loading: Walls," stated that the walls of the structure were "Designed for surcharge effects of 3′–0″ fill, vehicles mentioned above [tracked vehicles weighing not over 44,-000 lbs.], equivalent fluid pressure of soil & hydrostatic pressure."

4. Plaintiff says that even if the Note is to be construed as applying only to completed structures, as defendant contends, the 4-inch walls was "completed" when they collapsed, thereby making the Note applicable to them even under defendant's interpretation.

Although, in view of the disposition of this case on other grounds, no resolution of this dispute need be made, it would ap-

these respects, the "errors" of which plaintiff complains were so obvious that the conclusion is compelled that plaintiff either knew of them or certainly should have recognized them as such.

Here were long, thin walls standing completely unsupported on all sides except the rear. It would almost appear obvious to an inexperienced layman that it would not take much of a push from the rear to topple them. Certainly an experienced contractor such as plaintiff, headed as it is by a competent engineer as its active president, knew or should have known this. The entire record, especially the expert testimony, makes this plain. Hydrostatic pressure is a powerful force. While the walls were standing without support during the above-described interim construction period, it was clear that, if rain of any substantial amount occurred, pressures would begin to be built up and exerted from the rear which the walls could not withstand. This is exactly what happened. The conclusion is inescapable that either plaintiff knew this but decided to take a chance that it would not rain in any substantial amount or that, if the rains did come, plaintiff would be able to get the 2-foot wall or floor slab in before the hydrostatic pressure was sufficiently built up, or that, as sometimes happens, its organization simply slipped up in not recognizing what should have been obvious.

Nor can plaintiff's present protestations about lack of obviousness be accepted. When, more contemporaneously, it protested the contracting officer's rejection of its claim which then, as now,

was based upon defendant's alleged dereliction in improperly designing the walls, it flatly stated: "It appears obvious that this four inch wall would not sustain such [hydrostatic] pressure * * *."

■ While it may be true, as plaintiff then further contended, that the design of the walls "is a matter over which we did not have any control since the question of design is a function of the engineer [defendant]" and not of plaintiff "as a general contractor," it is not true that plaintiff was justified in blithely proceeding with its work in the face of obvious and recognized errors. The obligation was cast upon plaintiff to do something about it. It should either have promptly taken up the matter with defendant so that corrections could have been made in the design before the walls were built, or it should simply have taken appropriate steps to support the walls after they were built and until the adjacent supporting 2-foot concrete wall would be poured, or at least until the 2-foot floor slab would be poured, which would give support from the bottom.[5]

■■ While it is, of course, well settled, as the cases plaintiff relies on hold, that " * * * where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result," J. D. Hedin Constr. Co. v. United States, 347

---

pear that defendant's interpretation is the more reasonable because, although these "walls" were in a sense "completed," they were in essence nothing more than temporary structures which would ultimately become part of the walls that would result after the 2-foot concrete walls would be poured. The "monolithic" construction would thus result in only one "wall" on each side of the pit. Thus, the 4-inch wall would stand in its so-called "completed" state only temporarily and until the waterproofing could be applied to it and the

2-foot wall would be poured against it. However, the issue as to whether, under the "rule of ambiguity," plaintiff's interpretation is sufficiently reasonable so as to warrant acceptance, is not decided.

5. There was another pit (the "D" pit, as distinguished from the pit in question, the "B" pit) with similar block walls. The block walls of the "D" pit did not collapse. On August 10, the 2-foot floor slab was poured in the "D" pit, thereby affording support for the block walls at the bottom, where the hydrostatic pressure would be the greatest.

F.2d 235, 241, 171 Ct.Cl. 70, 76 (1965), and that "This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance," United States v. Spearin, supra, 248 U.S. at 137, 39 S.Ct. at 61, nevertheless it is also well settled that if a contractor knew or should have known of an obvious error in the plans or specifications, he must call it to the attention of the appropriate Government representatives so that proper steps may be taken with respect to the matter. Under such circumstances he cannot claim he was misled. Leal v. United States, 276 F.2d 378, 383, 149 Ct.Cl. 451, 460 (1960); Ring Constr. Corp. v. United States, 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958); Meyerstein v. United States, 137 F.Supp. 427, 431, 133 Ct.Cl. 694, 700 (1956); Ragonese v. United States, 120 F.Supp. 768, 770–771, 128 Ct.Cl. 156, 162 (1954). " * * * [W]hen [the contractor] is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government's representatives if he intends to bridge the crevasse in his own favor." Beacon Constr. Co. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 7 (1963). " * * * [A]n experienced contractor cannot rely on government prepared specifications where, on the basis of the government furnished data, he knows or should have known that the prepared specifications could not produce the desired result for ' * * * he has no right to make a useless thing and charge the customer for it.' R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 286, 124 Ct.Cl. 681, 683 (1953)." J. D. Hedin Constr. Co. v. United States, supra, 347 F.2d at 241, 171 Ct.Cl. at 77. The situation is analogous to that in which a contractor makes an obvious error in his bid of which the Government knew or should have known. Just as the Government must in such a situation take appropriate steps to apprise the bidder of his error, Chernick v. United States, 372 F.2d 492, 178 Ct.Cl. —— (1967), so, as the above cases make plain, a contractor who knows or should have known of an obvious Government error must apprise the Government thereof so that appropriate corrective measures may timely be taken.

Plaintiff contends that the very construction design and sequence that were required made impractical any feasible method of bracing or supporting the block walls on the open pit side prior to the pouring of the 2-foot concrete wall because of the danger of damaging the waterproof membrane covering the wall, and also because bracing would interfere with the pouring of the concrete for the 2-foot wall that was to be constructed against the block wall. That part of the pit adjacent to the wall had to be left clear of all construction materials in order to receive the concrete. Only the reinforcing steel for the 2-foot concrete wall could, plaintiff says, occupy such adjacent space and which steel itself would block off any supporting braces.

Although defendant strongly disputes these contentions, arguing that temporary bracing from the open pit side could feasibly be erected, it is plain that, again assuming *arguendo* their validity, some satisfactory solution nevertheless would have been found had plaintiff timely raised the problem. Indeed, when the walls were reconstructed, plaintiff arrived at the simple solution of anchoring the walls to the sheeting behind them. This was done by driving heavy nails in the mortar between the courses of the blocks. Thus the support came from the rear rather than the open pit side. This simple solution could just as well have been devised before the collapses as after.[6]

For all of the above reasons, the petition should be dismissed.[7]

---

6. What is inexplicable is why it was not at least applied to the north wall after the south wall collapsed.

7. In view of this disposition of the case, no findings have been made concerning the increased costs incurred by plaintiff.