**MAURICE MANDEL, INC., Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 19705.**

United States Court of Appeals, Eighth Circuit.

April 27, 1970.

Raymond D. Battocchi, Atty., Dept. of Justice, Washington, D. C., for appellant; William D. Ruckelshaus, Asst. Atty. Gen., and Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., and Patrick J. Foley, U. S. Atty., Minneapolis, Minn., on the brief.

William D. Howard, Rice & Efron, Minneapolis, Minn., for appellee.

Before GIBSON,. LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

Maurice Mandel, Inc. (Mandel), as a successful bidder, undertook to construct and lease to the Government a post office building in Stillwater, Minnesota, upon a site which Mandel agreed to purchase from the United States. After its bid had been accepted and a contract signed with the Government, Mandel discovered that it had under-estimated the cost of construction by relying on certain data which it claimed to be erroneous contained in and made part of the Government's invitation to bid. Mandel incurred unanticipated construction expenses of $7,932.00 for air conditioning and $495.95 for draining subsurface water.

Mandel brought an action against the Government in the district court under the Tucker Act, 28 U.S.C. § 1346(a) (2), and recovered a judgment on each of these two expense items. The United States appealed and presents a single issue on each claim, viz:

(1) Whether the Government warranted an estimate of air conditioning cooling load capacity contained in its invitation to bid, and

(2) Whether the Government warranted the depth of subsurface water at the proposed construction site.

We affirm on the claim for additional expense for air conditioning, but reverse on the additional construction expense for draining unanticipated subsurface water.

The documents submitted with the invitation to bid form our frame of reference for consideration of each of Mandel's claims. Those documents, which included a set of tentative plans and specifications, outlined the entire scope of the project. The tentative plans and accompanying data specified basic construction requirements to be incorporated into the final plans which were to be drawn by an architect employed by the party whose bid was accepted. The Government reserved the right to approve these additional plans.

## I.

## AIR CONDITIONING

Incorporated into the tentative plans were "Mechanical Notes" directing the bidder's attention to specific requirements for heating and air conditioning. These notes contained this specific item:

Estimated Cooling Load—183,000 BTU (See Addendum 1, Chap. 5, Par. I).

That addendum paragraph provided:

The capacities designated in the Specific Requirements are based on POD [Post Office Department] calculation for the tentative plan; however, in case of miscalculation or discrepancy, the actual loads based on the construction drawings shall apply and the Lessor shall submit building heating, ventilating and cooling load calculations as outlined in Fig. 1, Instructions for Thermal Load Calculations, using Form 2238, copies of which will be furnished by the Chief, Engineering Branch.

After award of the contract, Mandel employed a consulting engineer to prepare construction drawings. This engineer discovered that the Government had

substantially miscalculated the air conditioning needs for the proposed building. Instead of fifteen tons, the equivalent in capacity to 183,000 BTU load, a building of the size and construction specified by the Government required approximately twenty-five tons of capacity. Mandel, upon being advised of the discrepancy, notified the Post Office Department of its error and later requested that it reimburse Mandel for the additional expense incurred in installing sufficient capacity to properly cool the building. The Government denied this request.

As a basis for reversal, the Government argues that no warranty arises from an estimation. Further, the language contained in the addendum constituted an admonition that responsibility for calculating air conditioning requirements rested with the contractor. We consider each of these arguments.

An estimate often serves as an expedient to be used when the Government must guide bidders on a particular point but has no more precise information available. Womack v. United States, 389 F.2d 793, 182 Ct.Cl. 399 (1968).

▮ The term "estimate" as used here aptly connotes some variance in cooling requirements in the building as proposed and the one to be finally designed. Such term serves to encompass such changes in cooling load requirements attributable to modifications in the design of the proposed building within the ambit of the contract obligations. This language, however, does not serve to notify the bidder that substantial changes in the requirements are reasonably likely, since the final building is to be constructed in accordance with the basic requirements stipulated in the tentative plans. The use of the term "estimate" in the context

of this contract does not cast the responsibility for gross miscalculation upon the bidder. Here the actual error amounts to two-thirds more than the requirement specified in the tentative plan.

We perceive no reason for the inclusion of the cooling estimate as datum accompanying the tentative plans unless the Government intended the bidder to rely on this information. The Government might be presumed to speak with some knowledge or authority on this matter since it had prepared and submitted the tentative plan. See Hollerbach v. United States, 233 U.S. 165, 172, 34 S.Ct. 553, 58 L.Ed. 898 (1914). Otherwise, the Government need only have required that the bidder calculate the necessary cooling capacity as dictated by design criteria.[1]

In interpreting the term "estimate", we attach to it that meaning which would be understood by a reasonably intelligent person aware of all the circumstances surrounding the making of the contract. See Sun Oil Co. v. Vickers Refining Co., 414 F.2d 383, 387 (8th Cir., 1969); Restatement of Contracts § 230 (1932). Applying these familiar principles, we hold that a reasonable bidder in Mandel's circumstances would take the Government's estimate of its cooling load capacity as specifying a reasonably accurate requirement on which the bidder could safely rely. See Eastern Service Management Co. v. United States, 363 F.2d 729 (4th Cir., 1966). In these circumstances, the estimate or statement constituted a positive representation or a warranty. Womack, supra, 389 F.2d 793.

▮ The addendum clause furnishes no sound basis for the Government to avoid liability. Literally read, the clause addresses a caution to the "Lessor", a status not yet attained by Mandel as it submitted its bid, and this clause ad-

---

1. For example, P.O.D. [Post Office Department] Pub. 39A, Chap. 5, Par. I under the chapter entitled "Architectural Requirements" requires that the lessor in preparing final plans:

Calculate air circulations per hour using not more than 23° F. differential on the cooling cycle * * *. For cooling

* * * calculation, the occupancy should be considered as one person per 250 square feet of occupied floor area * * *. For each occupant in offices use 200 B.t.u. sensible and 250 B.t.u. latent heat and in workrooms use 220 B.t.u. sensible and 530 B.t.u. latent heat.

monishes him that in case of miscalculation actual load shall be based on construction drawings, although only tentative ones were then in existence. This addendum, by speaking of the construction drawings to be prepared in the future, dictates no present requirement that bidders assume responsibility for calculation of the cooling estimate contained in the present tentative plan. The Government demonstrates no basis for avoiding a liability predicated on its making a positive representation relied upon by the contractor, which representation proved to be false. See *Womack, supra,* 389 F.2d at 795, 801; Eastern Service Management Co., *supra,* 363 F.2d at 731.

## II.

## DRAINAGE

Mandel's claim for extra expense incurred in draining subsurface water which it encountered during construction lends itself to an analysis similar to that which we have considered in part I of this opinion. For the reasons stated below, however, we arrive at a contrary conclusion.

Much like the Mechanical Notes which we have already considered, the Government incorporated soil data in the tentative plan. That information was obtained from the proposed building site by an independent soil exploration company. The Government reproduced the boring logs from each of seven test holes and these disclosed water levels located at various subsurface depths between eight and one-half and thirteen feet. In performing the actual work, however, Mandel, during excavation, encountered bubbly springs at two and one-half to three feet below the surface. To protect building footings, Mandel installed tile to drain this water.

The resolution of liability on this claim turns on whether the Government, by submitting soil data to prospective bidders, expressly or impliedly represented or warranted the subsurface to be free of water at depths less than eight and one-half feet.

Soil borings are capable of disclosing only actual characteristics of the subsurface materials confined within the boring cylinder. Experience teaches that soil conditions within a reasonable area surrounding the bore are likely to possess characteristics substantially like the sample within the bore. See Morrison-Knudsen Co. v. United States, 345 F.2d 535, 541, 170 Ct.Cl. 712 (1965). But such sampling procedures may fail to accurately demonstrate overall area soil conditions. See T. F. Scholes, Inc. v. United States, 357 F.2d 963, 174 Ct.Cl. 1215 (1966); Fehlhaber Corp. v. United States, 151 F.Supp. 817, 138 Ct.Cl. 571, cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957).

■ With or without soil samples, the Government may choose to make a positive assertion concerning subsoil conditions. Such statement, if proved erroneous, saddles the Government with liability upon the basis of breach of an express warranty. *Hollerbach, supra,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898. Rather than hazard any conclusion from soil borings, the Government may undertake to supply underlying factual soil readings to a bidder. Its failure, however, to supply complete information subjects the Government to liability on the basis of breaching an implied warranty. Woodcrest Construction Co. v. United States, 408 F.2d 406, 410, 187 Ct.Cl. 249, petition for cert. filed, 38 U.S.L.W. 3098 (1969). The same liability for breach of warranty flows from the Government's issuance of inaccurate or misleading information. United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920); Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); Woodcrest Construction Co., *supra,* 408 F.2d 406; Walla Walla Port District v. Palmberg, 280 F.2d 237 (9th Cir., 1960); Ragonese v. United States, 120 F.Supp. 768, 128 Ct.Cl. 156 (1954). Caveatory and exculpatory contractual provisions will not shift the liability flowing from an express or implied representation made by the Government and reasonably relied upon by

the contractor. *Christie, supra,* 237 U.S. 234, 35 S.Ct. 565; *Walla Walla Port District, supra,* 280. F.2d 237. See Spearin v. United States, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

 The Government issued no express warranty concerning the location of subsurface water within the proposed construction site. Mandel concedes the competency of the firm conducting the soil explorations and the accuracy of its boring logs as reproduced in the bidding documents. Moreover, the Government concealed no relevant information in failing to advise bidders that the soil testing company, while assuming its tests to be representative ones, declined to warrant soil conditions at the construction site. Such disclaimer statement merely reiterates the obvious risk of some error which may be inherent in sampling soil through boring. No contractual liability flows from the Government's failure to advise its bidder of that which is already obvious. Allied Contractors, Inc. v. United States, 381 F.2d 995, 180 Ct.Cl. 1057 (1967). See Chris Berg v. United States, 389 F.2d 401, 182 Ct.Cl. 23 (1968); Archie and Allan Spiers, Inc. v. United States, 296 F.2d 757, 155 Ct.Cl. 614 (1961).

As we have already noted on this claim, the Government neither submitted any express representation (or warranty) nor undertook any responsibility to the bidder on the basis of an implied warranty. The parties otherwise expressly contracted with respect to the soil conditions; the pertinent clause in the bidding invitation reading:

> The bidders shall examine the site and be thoroughly acquainted with conditions thereon. The lessor shall be responsible for site conditions including subsoil characteristics, * * *.

Without any express or implied warranty by the Government, no basis exists on which to shift the responsibility for the soil conditions from the contractor to the Government. Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963); Archie and Allan Spiers,

Inc., *supra,* 296 F.2d 757. See generally United States v. Hathaway, 242 F.2d 897 (9th Cir., 1957); Corbin, Contracts § 598 (1960).

Accordingly, we affirm that part of the judgment in favor of Mandel discussed in part I of this opinion, but reverse that part of the judgment awarding Mandel damages as discussed in part II. Mandel shall be awarded fifty percent of its costs on this appeal.